PEOPLE v HUFFMAN

Docket No. 252315. Submitted February 9, 2005, at Grand Rapids.
    Decided May 10, 2005, at 9:05 a.m. Leave to appeal sought.

    Timothy B. Huffman was convicted by a jury in the 61st District
    Court, J. Michael Christensen, J., of indecent exposure after a
    videotape he produced for a television program was shown on cable
    television. A three-minute segment of the program showed only a
    closeup of a penis and testicles, which were marked with facial
    features and accompanied by voice-over commentary. The defen-
    dant appealed to the Kent Circuit Court, James Robert Redford, J.,
    which affirmed. The defendant then appealed by leave granted.

        The Court of Appeals held:

        1. The indecent exposure statute, MCL 750.335a, applies to an
    open or indecent exposure in the form of a televised image. The
    purposes of the statute are best fulfilled by focusing on the impact
    that offensive conduct might have on persons subject to an expo-
    sure. A televised exposure, while qualitatively different than a
    physical exposure, can nonetheless be more offensive and threaten-
    ing. The statute contains no limitation that prevents its application
    to a televised exposure.

        2. There was sufficient evidence that the indecent exposure
    occurred within the district court's venue. The videotaping of the
    segment did not constitute the exposure for which the defendant
    was charged. The offense occurred when the defendant arranged for
    delivery of the videotape to the cable channel for the purpose of
    having it distributed over the cable network into numerous homes,
    including many located in Grand Rapids.

        3. The defendant's conviction did not violate his First Amend-
    ment right to free speech. Because the segment contained both
    speech and nonspeech elements, and the regulation under the
    indecent exposure statute is content-neutral, the appropriate
    analysis is the four-part test announced in United States v
    O'Brien, 391 US 367 (1968), and applied by subsequent cases in a
    context similar to that of this case, nude dancing. To determine
    whether a governmental regulation is justified in such a context, a
    court must consider (1) if it is within the constitutional power of
    the government, (2) if it furthers an important or substantial
    governmental interest, (3) if the governmental interest is unre-

lated to the suppression of free expression, and (4) if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to furthering the governmental interest. The indecent exposure statute is within the constitutional power of the state and furthers substantial governmental interests. It does not proscribe the communication of any message, including those associated with indecent exposure, but proscribes the exposure itself. The incidental restriction on the defendant's First Amendment freedom is no greater than is essential to furthering the governmental interest in promoting public morality by prohibiting public nudity. The defendant would have been properly subject to conviction for indecent exposure had he staged the segment in a traditional public square. He is not entitled to greater First Amendment protections, and cannot avoid criminal liability, by channeling his exposure through a cable television network.

4. MCL 750.335a is not unconstitutionally vague, and gave the defendant fair notice that he could be convicted for the conduct at issue.

5. The defendant's claims concerning the trial court's exclusion of evidence regarding nudity in other television programs and refusal to give requested jury instructions have been abandoned on appeal in the absence of citation of supporting authority.

Affirmed.

1. CRIMINAL LAW — INDECENT EXPOSURE — TELEVISED EXPOSURES.

The indecent exposure statute applies to an "open or indecent exposure" in the form of a televised image (MCL 750.335a).

2. CRIMINAL LAW — INDECENT EXPOSURE — FIRST AMENDMENT.

The indecent exposure statute does not violate the First Amendment; the statute, as applied to conduct involving both speech and nonspeech elements, is within the constitutional power of the government and furthers the substantial governmental interest of promoting public morality by prohibiting public nudity, which interest is unrelated to the suppression of free expression; incidental restriction on alleged First Amendment freedoms resulting from the application of the statute is no greater than is essential to further that interest (MCL 750.335a).

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, *William A. Forsyth*, Prosecuting Attorney, and *Timothy K. McMorrow*, Chief Appellate Attorney, for the people.

*Varnum, Riddering, Schmidt & Howlett LLP* (by Peter J. Armstrong) and *Ralph C. Simpson, Gary N. Gershon,* and *Michael J. Steinberg* for the defendant.

Amici Curiae:

*Westrate and Holmstrom* (by *Mark A. Westrate*) and *Spiegel & McDiarmid* (by *James N. Horwood, Peter J. Hopkins,* and *Allison L. Driver*) for Alliance for Communications Democracy and the Alliance for Community Media.

*Robin S. Whitehead* for Morality in Media, Inc.

Before: SCHUETTE, P.J., and FITZGERALD and BANDSTRA, JJ.

BANDSTRA, J. Defendant produced and arranged for the cable transmission of a television show featuring exposed genitalia. In this appeal, he seeks to have his conviction under Michigan's open or indecent exposure statute overturned primarily because of his arguments that the statute does not apply to television programming and that, if it does, he cannot be convicted under First Amendment principles. We conclude, both because the statute includes no limitation that would prevent its application to television exposures and because such exposures can be more offensive than a more traditional public exposure, that the statute was properly applied against defendant. Further, employing the four-part test required by the United States Supreme Court in *United States v O'Brien,* 391 US 367; 88 S Ct 1673; 20 L Ed 2d 672 (1968), and its progeny, we conclude that defendant's conviction under the statute did not violate the First Amendment.

I. BASIC FACTS AND PROCEEDINGS BELOW

Defendant regularly produces television programs that are distributed on the Grand Rapids public-access cable channel, GRTV. At issue here is the sixty-eighth episode of the show he has entitled "Tim's Area of Control." After defendant submitted a videotape of that episode to GRTV, it was shown on March 31, 2000, and April 7, 2000, both times between 10:30 and 11:00 p.m., without any prescreening. The episode included a three-minute segment in which a flaccid penis and testicles marked with facial features were the only objects within camera range. During this segment, a voice-over was heard identifying the penis character as "Dick Smart" and providing purportedly humorous commentary as if on behalf of the character.[1] Only Dick

---

[1] The transcript of the segment is as follows:

Hey, how ya doing, ya, ya, ya. Hi, I'm Dick Smart I am a comedian, yeah, stand up, ha. Yeah, yeah, look over there, look over there it awe [sic] there is a whole table of dick heads over there, I can't believe it yeah, what a crowd, what a crowd. Oh I love it when it's exciting like this, ya know what I mean.

Hey listen I got a joke for you, 2 guys they go into a bar, yeah, yeah, yeah, whats [sic] the matter with you lady, you never seen a dick before? One guy says to the other guy, hey I gotta go to the head, order me a draft beer and a tuna fish sandwich would ya and he says yeah. Okay so the guy kinda goes into the bar, ya and the bartender says, "what do ya need" he says I need 2 draft beers and a tuna fish sandwich. What what ya heard this one before or what, shut up then okay. So he says okay he says I'll bring your drink to you, the guy goes down to the bar, turns around half-way down the bar and goes hey, he goes are you gay? The guy says what, no, I'm just in a god [sic] mood, ha, ha ha, awe [sic] you heard that one before, I can't believe it, don't you people laugh or what, are ya all getting enemas?

What's the deal with you over there you never seen a funny dick before or what (laughter). Yeah, I was in the grocery store the other day a guy comes up and he says "hey, you're a dick" I says

Smart was shown on the videotape; the rest of the body that would otherwise be visible was shrouded with a cloth.

The GRTV public-access channel is available to approximately 46,000 cable subscribers in the Grand Rapids community. One of those subscribers who was watching on April 7, 2000, lodged a complaint with GRTV and, following an investigation, a search warrant was executed and the police seized a copy of a videotape containing the Dick Smart segment at defendant's home. Defendant was arrested and charged with a violation of MCL 750.335a, Michigan's "open or indecent exposure" statute. He was convicted in district court and sentenced to one day in jail, with credit for time served, and twelve months of probation. He was also fined $500 and ordered to pay costs totaling an additional $525. Defendant appealed his conviction to the circuit court, which affirmed. We granted defendant's application for leave to appeal.

## II. DOES THE "OPEN OR INDECENT EXPOSURE" STATUTE APPLY TO TELEVISION IMAGES?

Defendant first argues that his conviction must be reversed because MCL 750.335a cannot be properly

yeah so are you, ha, ha. I can't believe it, yeah, yeah, yeah, yeah, yeah, I was in the army ya know, yeah, yeah, I didn't do much, ya know what I mean? I just hung around (laughter). Yeah, yeah, so I was walking down the sidewalk the other day and ya know I was just looking around and I don't know about you, but when I see a good looking woman and it's kind of balmy out and I kinda change I'm like a Doctor Jekyll and Mr. Hyde kinda guy (laughter). Ya know what I mean some people, I had a woman tell me the other day she thought I looked like Hulk Hogan (laughter) I said yeah, you crazy stupid bitch, Hulk Hogan, hell, he's rich, yeah I'm just some dick head I just ya know I make people laugh, I get a couple of bucks ya know what I mean everyone's gotta eat, ya know what I'm sayin. Well ah a little two step I learned when I was in the Nam-yeah.

construed to apply to televised images. Construction of a statute is a question of law that we review de novo. *People v Spanke*, 254 Mich App 642, 645; 658 NW2d 504 (2003).

The statute under which defendant was charged and convicted provided, in relevant part, "Any person who shall knowingly make any open or indecent exposure of his or her person or of the person of another shall be guilty of a misdemeanor . . . ." MCL 750.335a.

Defendant does not argue that he did not act "knowingly" in producing and submitting the Dick Smart tape for cable distribution, nor does it matter under the statute whether the character was portrayed by defendant's penis or that of another person. At issue here is whether televising an image of a naked penis is an "open or indecent exposure" under the language of the statute. Defendant argues that "[t]he application of this statute or, indeed, any indecent exposure statute, to television or film images is unprecedented." While that may well be the case, defendant points to no authority holding that the language of this statute, or any similar statute, does not encompass televised images.

While not factually similar, *People v Vronko*, 228 Mich App 649; 579 NW2d 138 (1998), provides us guidance on this question. A panel of our Court construed MCL 750.335a in a manner "consistent with our interpretation of the statutes proscribing 'gross indecency,' " MCL 750.338 through 750.338b. *Vronko, supra* at 656. The panel noted that "[t]he gross indecency statutes seek to protect the public from the possibility of being exposed to certain acts of sexual conduct. Such conduct is grossly indecent 'when an unsuspecting member of the public, who is in a place the public is generally invited or allowed to be, could have been exposed to or viewed the act.' " *Id.* (citation omitted).

Further, the panel noted that "open exposure" under MCL 750.335a has been defined as " 'any conduct consisting of a display of any part of the human anatomy under circumstances which create a substantial risk that someone might be offended.' " *Id.*, quoting *In re Certified Question (Jewell Theatre Corp v Oakland Co Prosecutor)*, 420 Mich 51, 63; 359 NW2d 513 (1984) (BOYLE, J., concurring). The *Vronko* panel adopted Justice BOYLE's reasoning that " '[t]his standard would require evaluation of the setting in which the exposure took place in order to determine whether anyone might reasonably have been expected to observe it and, if so, whether the person might reasonably have been expected to have been offended by what was seen.' " *Vronko, supra* at 656-657, quoting *In re Certified Question, supra* at 63 (BOYLE, J., concurring).

Similarly here, we conclude that the purposes of the indecent exposure statute are best fulfilled by focusing on the impact that offensive conduct might have on persons subject to an exposure. Defendant admits that, had he staged the Dick Smart production in a traditional "public square," like Grand Rapids' downtown Calder Plaza, the statute would apply. Nonetheless, he argues that such a live, in-person exhibition presents a greater threat and offense to observers than a televised exhibition, where the exposed person is not physically present.

While we agree that a televised exposure is qualitatively different than a physical exposure, we note that, in some ways, it can be more offensive and threatening. While a person might minimally suspect that some stranger might expose himself in a public forum, to be subjected to a televised exposure in the privacy of a home is likely a more shocking event. Further, defendant's exposure, while televised, was presumably more

of an immediate closeup than would occur if he had been physically present with those subject to his exposure. The Dick Smart character portrayed on TV screens was probably larger than actual size and the exposure continued for fully three minutes, much longer than would have likely been allowed on Calder Plaza or in some other public square.

There is no doubt that defendant should have expected, or in fact did expect, that someone would observe the Dick Smart segment and be offended by it. *Vronko, supra* at 656-657. Like the courts below, we see no reason to read into the statute a limitation that would prevent its application to defendant's televised and, therefore, powerfully effective exposure. We hold that the statute was properly applied to encompass an "open or indecent exposure" in the form of a televised image.

This conclusion regarding MCL 750.335a is not disturbed by defendant's argument that another statute, MCL 750.38, also covers images of nudity.[2] While a criminal charge might have been brought under MCL 750.38, the prosecutor had discretion to bring a charge under MCL 750.335a instead. *People v Ford*, 417 Mich 66, 92; 331 NW2d 878 (1982). For the reasons stated, defendant's conduct fell within the purview of MCL 750.335a and the charge brought against him under that statute was appropriate.

---

[2] MCL 750.38 provides, in relevant part:

> Any person who shall post, place or display on any sign board, bill board, fence, building, sidewalk, or other object, or in any street, road, or other public place ... any representation of the human form in an attitude or dress which would be indecent in the case of a living person, if such person so appeared in any public street, square or highway, shall be guilty of a misdemeanor.

### III. DID SUFFICIENT EVIDENCE OF VENUE EXIST?

Defendant further contends that the trial court erred by denying his motion for a directed verdict because there was insufficient evidence showing that the indecent exposure occurred within the venue of the district court, the city of Grand Rapids. We review the record de novo to determine whether a rational trier of fact could have determined that this element of the crime was proven beyond a reasonable doubt. *People v Aldrich*, 246 Mich App 101, 122; 631 NW2d 67 (2001).

Defendant's argument concentrates on the lack of evidence regarding the place where the Dick Smart film was taped. However, that taping did not constitute the "exposure" for which defendant was charged under the statute; no one allegedly observed the taping or took offense because of it. Instead, the exposure offense occurred when defendant arranged for the tape's delivery to GRTV, in Grand Rapids, for the purpose of having it distributed by cable network into thousands of homes, many of which are located in Grand Rapids. We reject defendant's argument in this regard.

### IV. DOES THE CONVICTION VIOLATE DEFENDANT'S FIRST AMENDMENT RIGHT TO FREE SPEECH?

Defendant argues that his First Amendment right to free speech was violated by his conviction under the indecent exposure statute. Questions regarding the constitutionality of statutes are matters of law that we review de novo. *People v Jensen (On Remand)*, 231 Mich App 439, 444; 586 NW2d 748 (1998).

This issue is governed by a case concerning draft card burning, *O'Brien*, and two cases applying *O'Brien* in a context similar to this case, i.e., nude dancing, *Barnes v Glen Theatre, Inc*, 501 US 560; 111 S Ct 2456; 115 L Ed

2d 504 (1991), and *City of Erie v Pap's AM*, 529 US 277; 120 S Ct 1382; 146 L Ed 2d 265 (2000). In *O'Brien*, the Supreme Court analyzed the act of burning a draft card as one involving " 'speech' and 'nonspeech' elements . . . combined in the same course of conduct . . . ." *O'Brien, supra* at 376. The Court held that "a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms" applicable to the speech elements. *Id.* The *O'Brien* Court announced a four-part test for determining whether a governmental regulation is sufficiently justified in this context: a court must examine "if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 377.

The four-part *O'Brien* test was used by a plurality of justices in *Barnes*.[3] The *Barnes* defendants had been convicted under an Indiana statute providing, in pertinent part, that " '[a] person who knowingly or intentionally, in a public place . . . appears in a state of nudity . . . commits public indecency, a Class A mis-

---

[3] A fourth justice "agree[d] with the plurality that the appropriate analysis to determine the actual protection required by the First Amendment is the four-part enquiry described in [*O'Brien*]," but applied that analysis differently. *Id.* at 582 (Souter, J., concurring). In addition, Justice Scalia concurred in the judgment of the plurality, reasoning that the First Amendment was simply inapplicable to the public nudity statute. *Id.* at 572 (Scalia, J. concurring) ("[T]he challenged regulation . . . as a general law regulating conduct and not specifically directed at expression . . . is not subject to First Amendment scrutiny at all."). While we review defendant's conviction under the *Barnes* plurality's approach, we note that it would also be upheld under the analysis employed by Justice Scalia.

demeanor.' " *Barnes, supra* at 569 n 2 (opinion of Rehnquist, C.J.), quoting a former version of Ind Code 35-45-4-1(a). The defendants were businesses that staged adult entertainment for their patrons, along with nude female dancers they employed.

With respect to the first two parts of the *O'Brien* analysis, the *Barnes* plurality held that "[t]he public indecency statute is clearly within the constitutional power of the State and furthers substantial governmental interests." *Id.* at 567. The justices noted that "the statute's purpose of protecting societal order and morality is clear" and that "[p]ublic indecency statutes of this sort are of ancient origin and presently exist in at least 47 States." *Id.* at 568. Further, "[p]ublic indecency statutes such as the one before us reflect moral disapproval of people appearing in the nude among strangers in public places." *Id.* "This and other public indecency statutes were designed to protect morals and public order. The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals, and we have upheld such a basis for legislation." *Id.* at 569.

With respect to the first two parts of the *O'Brien* test, we discern no difference between the Indiana public nudity statute in *Barnes* and the Michigan indecent exposure statute at issue here. Adopting the analysis of the Supreme Court as equally applicable here, we conclude that Michigan's indecent exposure statute is clearly within the constitutional power of the state and that it furthers substantial governmental interests.

With respect to the third part of the *O'Brien* test, the *Barnes* plurality held that the governmental interest in protecting morals and public order through the prohibition of public nudity "is unrelated to the suppression of free expression." *Id.* at 570.

Respondents contend that even though prohibiting nudity in public generally may not be related to suppressing expression, prohibiting the performance of nude dancing is related to expression because the State seeks to prevent its erotic message . . . .

But we do not think that when Indiana applies its statute to the nude dancing in these nightclubs it is proscribing nudity because of the erotic message conveyed by the dancers. Presumably numerous other erotic performances are presented at these establishments and similar clubs without any interference from the State, so long as the performers wear a scant amount of clothing. Likewise, the requirement that the dancers don pasties and G-strings does not deprive the dance of whatever erotic message it conveys; it simply makes the message slightly less graphic. The perceived evil that Indiana seeks to address is not erotic dancing, but public nudity. The appearance of people of all shapes, sizes and ages in the nude at a beach, for example, would convey little if any erotic message, yet the State still seeks to prevent it. Public nudity is the evil the State seeks to prevent, whether or not it is combined with expressive activity. [*Id.* at 570-571.]

Similarly, the "perceived evil" that Michigan seeks to address through its indecent exposure statute is not the communication of some message associated with indecent exposure; it is the indecent exposure itself. In other words, defendant's Dick Smart segment is not proscribed because of any message it conveys; similar conduct by others having no message whatsoever would be similarly proscribed. Further, the requirement of some minimal clothing does not deprive Dick Smart of his message; it simply makes that message slightly less graphic. Thus, Michigan's indecent exposure statute does not prevent the conveyance of any message. It merely requires that messages must be conveyed within minimal bounds of proscribed conduct having nothing to do with expression.

Finally, the *Barnes* plurality considered the fourth part of the *O'Brien* test:

> The fourth part of the *O'Brien* test requires that the incidental restriction on First Amendment freedom be no greater than is essential to the furtherance of the governmental interest. As indicated in the discussion above, the governmental interest served by the text of the prohibition is societal disapproval of nudity in public places and among strangers. The statutory prohibition is not a means to some greater end, but an end in itself. It is without cavil that the public indecency statute is "narrowly tailored"; Indiana's requirement that the dancers wear at least pasties and G-strings is modest, and the bare minimum necessary to achieve the State's purpose. [*Id.* at 571-572.]

Again, we find this analysis applicable to the Michigan indecent exposure statute, and conclude that the incidental restriction on defendant's First Amendment freedom is no greater than is essential to the furtherance of the governmental interest in promoting public morality by prohibiting public nudity.

In a more recent opinion, a plurality of justices of the Supreme Court[4] again employed the *O'Brien* test to conclude that a city ordinance prohibiting appearing in public in a "state of nudity" did not violate First Amendment rights in application to nude dancing. *Erie, supra* at 296-302 (opinion of O'Connor, J.). With respect to the second part of the *O'Brien* test, whether the public nudity ordinance furthered an important governmental interest, the plurality concentrated on "harmful

---

[4] The plurality in *Erie* consisted of four justices. *Erie, supra* at 282 (opinion of O'Connor, J.). In addition, Justice Scalia was joined by Justice Thomas in the view, set out earlier in his concurring opinion in *Barnes*, that, because the ordinance prohibited the act of going nude in public, irrespective of any expressive purposes, " 'it is not subject to First Amendment scrutiny at all.' " *Id.* at 307-308 (Scalia, J., concurring), quoting *Barnes, supra* at 572 (Scalia, J., concurring).

secondary effects associated with nude dancing . . . ." *Id.* at 296. The preamble to the ordinance stated that its purpose, in part, was to prevent " ' "an atmosphere conducive to violence, sexual harassment, public intoxication, prostitution, and the spread of sexually transmitted diseases and other deleterious effects" ' " in association with nude dancing. *Id.* at 290 (citations omitted). Defendant here argues that such "harmful secondary effects" are necessary to justify Michigan's public indecency statute, but we do not conclude that *Erie* stands for this proposition. The prevention of such secondary effects is certainly sufficient to satisfy the second part of the *O'Brien* test, but nothing in *Erie* suggests that it is necessary. No such secondary effects were considered in *Barnes*; the plurality found sufficient governmental interest merely on the basis that preventing public nudity promotes public morality. *Barnes, supra* at 568-569 (opinion of Rehnquist, C.J.). *Erie* did not disavow that approach, and we conclude that the promotion of public morality through the prohibition of indecent exposure is a sufficient governmental interest to satisfy the second part of the *O'Brien* test. "The traditional power of government to foster good morals (*bonos mores*), and the acceptability of the traditional judgment . . . that nude public dancing *itself* is immoral, have not been repealed by the First Amendment." *Erie, supra* at 310 (Scalia, J., concurring) (emphasis in original). The same analysis applies in this indecent exposure case.

 Defendant seeks to avoid the analysis of *O'Brien, Barnes,* and *Erie* by arguing that we should examine precedents involving regulations of cable television programmers, citing especially *Denver Area Ed Telecom Consortium, Inc v Fed Communications Comm*, 518 US 727; 116 S Ct 2374; 135 L Ed 2d 888 (1996), and *United States v Playboy Entertainment Group, Inc,* 529 US 803;

120 S Ct 1878; 146 L Ed 2d 865 (2000). However, as the plurality opinion in *Erie* expressly stated, "We now clarify that government restrictions on public nudity such as the ordinance at issue here should be evaluated under the framework set forth in *O'Brien* for content-neutral restrictions on symbolic speech." *Erie, supra* at 289 (opinion of O'Connor, J.). In his separate opinion, Justice Souter specifically agreed with that conclusion. *Id.* at 310 (Souter, J., concurring in part and dissenting in part). Thus, a majority of the Supreme Court held that cases like that before us now, involving content-neutral restrictions on expressive conduct that constitutes symbolic speech, must be tested under the *O'Brien* analysis. Cases like *Denver* and *Playboy*, which involve content-specific restrictions on speech itself, are simply inapposite to the question presented in this appeal.

Further, the United States Supreme Court has noted that, of all forms of communication, it is broadcasting that has "the most limited First Amendment protection." *Fed Communications Comm v Pacifica Foundation*, 438 US 726, 748; 98 S Ct 3026; 57 L Ed 2d 1073 (1978). The Court so reasoned, in part, because "the broadcast media have established a uniquely pervasive presence in the lives of all Americans," meaning that "[p]atently offensive, indecent material . . . confronts the citizen, not only in public, but also in the privacy of the home," generally without sufficient prior warning to allow the recipient to avoid it. *Id.* This same reasoning applies to cable television broadcasting. *Denver, supra* at 744 (opinion of Breyer, J.). Under *O'Brien* and its progeny, defendant would have been properly subject to conviction for indecent exposure had he staged the Dick Smart segment in a traditional public square. He becomes entitled to no greater First Amendment pro-

tection, and cannot inoculate himself against criminal liability, by channeling his exposure through a cable television network.

V. IS MCL 750.335A UNCONSTITUTIONALLY<br>VAGUE AND OVERBROAD?

Defendant contends that the statute is unconstitutionally vague and overbroad. Questions regarding the constitutionality of statutes are matters of law that we review de novo. *Jensen, supra* at 444.

In *Vronko,* a panel of our Court considered whether the language "open or indecent exposure" in MCL 750.335a was unconstitutionally vague and determined that it was not. The panel noted that "[a] statute is not vague if the meaning of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises, or their generally accepted meaning." *Vronko, supra* at 653. The panel noted that the Michigan Supreme Court has reasoned that the " 'well settled and generally known significance of the phrase "indecent and obscene exposure of the person" is the exhibition of those private parts of the person which instinctive modesty, human decency or natural self-respect requires shall be customarily kept covered in the presence of others.' " *Id.,* quoting *People v Kratz,* 230 Mich 334, 337; 203 NW 114 (1925). The panel further reasoned that, under common dictionary definitions of the words contained in MCL 750.335a, the defendant was fairly placed on notice that his intentional exposure of his genitals in a place where such exposure was likely to be an offense against generally accepted standards of decency constituted "indecent exposure." *Id.* at 654.

To the extent that defendant here argues that he was not fairly on notice that the conduct leading to his conviction was "open or indecent exposure," we agree

with *Vronko* and reject that argument. Further, the trier of fact in this case was instructed on the meaning of "open or indecent exposure" as those terms have been described and defined in judicial precedents; it was not left with "unstructured and unlimited discretion to determine whether an offense had been committed," in contravention of constitutional principles. *Id.*

It seems, however, that defendant's primary challenge regarding the vagueness of the statute is that he was not on fair notice that it could apply to an exposure occurring through a cable network telecast, rather than one that was live and in-person. We have considered a similar argument in part II of this opinion, and we reiterate the conclusion reached there. The statute does not by its terms suggest, in any manner, that an "open or indecent exposure" can occur only if the exposing person and the victims subject to the exposure are physically in the same place. As we noted, the offense to those subjected to the exposure may, in fact, be greater if the exposure is accomplished through a television medium. The record seems clear that defendant intended to maximize the impact of his open or indecent exposure by using the cable medium, and we can see no reason to conclude that he was not fairly on notice that a criminal charge and conviction could result.

Finally, we note that this case involves a First Amendment argument, meaning that the statute might be subject to an argument that it is overly broad. *Id.* at 652. However, other than mentioning this in passing as part of his vagueness challenge, defendant makes no further First Amendment argument beyond that which we have already considered in part IV of this opinion. To the extent that defendant would raise a separate overbreadth argument, we consider that argument waived.

VI. EXCLUSION OF EVIDENCE AND JURY INSTRUCTIONS

With respect to the manner in which his trial was conducted, defendant first argues that the trial court erred by excluding evidence regarding nudity in other television programming. The decision whether to admit evidence is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *People v Katt*, 468 Mich 272, 278; 662 NW2d 12 (2003).

Defendant presents only a cursory argument on this issue, without any supporting authority, and we consider this claim abandoned. *People v Watson*, 245 Mich App 572, 587; 629 NW2d 411 (2001). Further, even if we were to conclude that defendant had preserved this claim and that it had merit, any error would be presumed harmless under MCL 769.26 unless it was outcome-determinative. *People v Whittaker*, 465 Mich 422, 426-427; 635 NW2d 687 (2001). Assuming, as we have today decided, that MCL 750.335a reaches defendant's conduct and that the statute is constitutional, the evidence of defendant's guilt is overwhelming. We do not conclude that, had defendant been allowed to introduce the evidence at issue here, the outcome of his trial would have been different.

Defendant also contends that various jury instructions he proffered to the trial court were improperly rejected. Again, however, defendant cites no authority in support of the instructions offered, and he has abandoned this issue. *Watson, supra*. And again, this argument fails on the merits, even if it had been properly presented. We review jury instructions in their entirety to determine if reversal is required on the basis of an error in jury instructions. *People v Moldenhauer*, 210 Mich App 158, 159; 533 NW2d 9 (1995). If the jury instructions, taken as a whole, sufficiently protect a

defendant's rights, reversal is not required. *Id.* Error requiring reversal only occurs if requested instructions (1) were substantially correct, (2) were not substantially covered in the charge given to the jury, and (3) concerned an important point in the trial so that failure to give them seriously impaired the defendant's ability to present a defense. *Id.* at 159-160. We have reviewed the instructions the trial court gave the jury and conclude that, taken as a whole, they accurately reflected the elements of the crime charged and otherwise sufficiently protected defendant's rights. The additional instructions that defendant advocated were either erroneous as a matter of law, cumulative to the instructions actually given, or a reiteration of arguments defendant was allowed to present about how the case should be resolved. We conclude that the trial court did not err by failing to give the jury the additional instructions.

We affirm.