# Court of Appeals, State of Michigan

# ORDER

People of MI v Anton Blevins

Docket No. 315774

LC No. 12-001086-FC

Amy Ronayne Krause
Presiding Judge

Kirsten Frank Kelly

Douglas B. Shapiro
Judges

On the Court's own motion the January 12, 2016 opinion is hereby VACATED, and a new opinion is attached.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

FEB 11 2016

Date

Chief Clerk

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANTON T. BLEVINS,

        Defendant-Appellant.

FOR PUBLICATION
February 11, 2016
9:00 a.m.

No. 315774
Wayne Circuit Court
LC No. 12-001086-FC

Before: RONAYNE KRAUSE, P.J., and K. F. KELLY and SHAPIRO, JJ.

RONAYNE KRAUSE, P.J.

Defendant was convicted by a jury of five counts of assault with intent to do great bodily harm less than murder, MCL 750.84, one count of second-degree murder, MCL 750.317, and one count of felony firearm, MCL 750.227b. The trial court sentenced him to five to ten years' imprisonment for each of his assault with intent to do great bodily harm less than murder convictions and to thirty to sixty years' imprisonment for second-degree murder, all to be served concurrently, and the mandatory two-year felony firearm conviction, to be served consecutively as provided by felony firearm statute. Defendant appeals his convictions and sentences. We affirm defendant's convictions, but vacate his sentences and remand for resentencing.

The victims in this case were part of a group of friends who went to downtown Detroit to celebrate the graduation of one of Carlos Spearman. The group consisted of Spearman, Courtney "Cortez" or "Tez" Smith, DeMario Drummond, Philip Knott, Raleigh Ross, Zachery Easterly, Raymond Malone, and Ron Banks. Some of the friends were football players at Wayne State University at the time. Spearman and a few of the others were drinking, but Smith was not and served as the group's designated driver that evening. After being denied access to Club Envy because the bouncer deemed Spearman too intoxicated, the group headed to a Coney Island for him to sober up. On the way, the group encountered some men handing out fliers; one of the friends recalled that among the people handing out fliers was defendant's eventual co-defendant, Quintin King.[1]

---

[1] King was found guilty of first-degree murder, six counts of assault with intent to commit murder, and felony firearm. His convictions are not at issue in the instant appeal.

Also on the way, Easterly decided to relieve himself in an alley in which Courtney's car was parked. Also parked there was another car, and while he was urinating, several people approached Easterly, one of whom expressed concern that Easterly was urinating on the person's car. The friends' recollections of how many people were in the approaching group varied, but several of them identified King, who proceeded to punch Easterly. Several of the friends also identified defendant as a member of the group.[2] The two groups had a brief physical struggle before separating approximately 12 feet from each other.

The two groups exchanged some words, and King said to Ross "we got a big fellow here. Here, got something for you." Then Blevins flashed a gun he had in his pants at the group of friends. Blevins also commanded the group of friends to back up, which they obliged. Malone then heard King say to Blevins, "give me the Mag. Give me the Mag." Blevins then apparently passed the gun to King. Smith tried to neutralize the fight once the gun was shown. King then fired a shot into the pavement, and the group of friends fled, or attempted to flee, for safety. Spearman was shot in the leg, and Smith was fatally shot through his airway. Ten casings were found at the scene identified as .45 caliber.

During the ensuing homicide investigation, several of the friends were shown multiple photographic lineups, first including King, and later including defendant. In one of the latter arrays, Malone identified defendant as the "guy that handed him [King] the gun" and that "he [defendant] said I advise y'all to step back. Then he lifted up his shirt and flashed the gun." Malone did not see the gun being passed, but he assumed it happened because defendant showed the gun and King shot a gun that looked identical. Ross was shown a photograph array that included defendant and identified him in the photograph, but Ross did not see defendant do anything other than be a part of the group. Knott claimed to have spoken with police and looked at photographs, but the officer in charge of the case, Derryck Thomas, did not have a record of Knott being interviewed because Knott avoided being a part of the police investigation. There are no facts in evidence that the police acted improperly or suggestively with the photographic arrays, although defendant contends that it was improper to place him in the first spot on the photographic arrays that included him.

Allante Mosley,[3] who was in jail for charges unrelated to the instant case, approached officers because he claimed to have information about a homicide. Officer Thomas and an ATF agent spoke with Mosley and concluded that he just wanted help with his current charges. They remarked that Mosley looked like King, to the point of being possible brothers or mistaken for each other. There was never a deal reached between Mosley and the People. Officer Thomas saw no value in adding Mosley to a lineup with King. However, Dequan Todd, who was also in jail awaiting unrelated charges of which he was eventually acquitted, shared a cell with Mosley for a month, during which time Mosley allegedly openly claimed in the jail ward that he was responsible for "the Wayne State murder." Todd later shared a cell with King and informed King of Mosley's comments. King's lawyer mentioned Todd's potential testimony to

---

[2] A significant issue at trial and on appeal is whether that identification was accurate.

[3] Mosley is also spelled "Moseley" in jail records.

defendant's lawyer however, defendant's lawyer decided that this information did not seem credible and never contacted Todd. However, after defendant was convicted, defendant moved for a new trial, asserting, inter alia, that Todd provided newly discovered evidence. The trial court denied the motion.

Defendant first argues that his identification by four witnesses was the product of impermissibly suggestive pre-trial procedures that led to an irreparable misidentification. In particular, he argues that the photographic arrays were improper and that an expert witness should have been presented on the topic of eyewitness identification. Defendant argues that eyewitness identification is the least reliable kind of evidence in a criminal conviction, and there have been 250 exonerations based on DNA, 76% of which contained misidentification as a factor. Defendant relies on a recent New Jersey Supreme Court holding that discussed problems with identification testimony and a standard for how to judge the reliability of identification testimony. *State v Henderson*, 27 A3d 872, 896 (2011). He also argues that his in-court identification was highly unreliable and likely the product of false memories; for example, he argues, Knott identified him because he was one of the "only brothers sitting at the table," and this occurred almost two years after the incident. He argues that there was no independent basis for his identification other than unduly suggestive procedures before trial. See *People v McElhaney*, 215 Mich App 269, 286-288; 545 NW2d 18 (1996).

A trial court's decision to admit identification evidence will not be reversed unless it is clearly erroneous. Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made. *People v McDade*, 301 Mich App 343, 356; 836 NW2d 266 (2013). Erroneously admitted identification testimony warrants reversal only when the error is not harmless beyond a reasonable doubt. *People v Hampton*, 138 Mich App 235, 239; 361 NW2d 3 (1984). A photographic identification procedure can be so suggestive as to deprive the defendant of due process. *People v Gray*, 457 Mich 107, 111; 577 NW2d 92 (1998). The fairness of an identification procedure is evaluated in light of the totality of the circumstances. *People v Lee*, 391 Mich 618, 626; 218 NW2d 655 (1974).

Defendant is of course correct in asserting that "identification was the key issue in this case," so we agree that the propriety thereof is highly significant. We are aware that the State of New Jersey has expounded on the scientific evidence tending to show that eyewitness testimony is inherently unreliable. See *Henderson*, 27 A3d at 896. However, that case is not binding on this Court. See *People v Jamieson*, 436 Mich 61, 86-87; 461 NW2d 884 (1990). More importantly, irrespective of whether eyewitness testimony is unreliable in general, it requires a highly tenuous leap of logic to extrapolate that *defendant's* identification *in particular* must be wrong; put another way, just because the witnesses might have been mistaken does not mean they actually were. Furthermore, because fairness is assessed on the basis of a totality of the circumstances, it is also relevant whether defendant had a meaningful opportunity to argue to the jury why the witnesses should not be believed.

We note that Michigan is not unfamiliar with the concept that human memory and perception are fallible. The standard jury instruction, which the trial court properly gave to the jury, clearly requires the jury to evaluate how reliable any witness's identification might have been. Defendant had ample opportunity to argue why the *specific* witnesses against him should have been deemed unreliable, including why he believed Knott's identification must be

-3-

guesswork. We perceive no reason why placing defendant's photograph first in a lineup is inherently suggestive, and in a random assortment the first slot is no less likely than any other. Defendant contends that the lineups were not "double blind,[4]" so the officers conducting the lineup might have subtly or unconsciously suggested a "correct" choice to the witnesses, but this conclusion is pure speculation. The fact that not all witnesses presented identical testimony or even identified Defendant is simply normal. Any infirmities either were or could have been presented to the jury, and the jury was properly instructed to consider these infirmities. Whether or not the lineups could have somehow been conducted "better," defendant has not satisfied his burden of establishing that the trial court erred in finding them not unduly suggestive.

Defendant next argues that he received ineffective assistance of counsel because trial counsel did not present an expert witness on eyewitness identification, did not object to Knott's identification of him, and agreed to an erroneous jury instruction regarding identification rather than seeking an instruction based on the New Jersey case referenced above, *Henderson*.

Trial counsel is presumed to have been effective, and defendant must prove otherwise. *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012). We will not substitute our judgment for that of counsel regarding matters of trial strategy, nor will we assess counsel's competence with the benefit of hindsight. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). To constitute ineffective assistance, trial counsel's performance must have fallen below an objective standard of reasonableness, and that subpar performance must likely have affected the outcome of the proceedings and rendered the proceedings unfair or unreliable. *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

Trial counsel's strategy was to persuade the jury that defendant was merely present at the scene of the crime and that he had no involvement in the shooting. As the lower court found in its decision on motion for new trial, counsel made strategic and reasonable choices in light of his trial strategy. His cross-examination of witnesses coincided with the court's instructions on identification: he impeached witnesses on issues of intoxication, lighting, distance, discrepancies in descriptions, and the amount of time each witness had to make an observation. Although Defendant believes that additionally presenting an expert on eyewitness testimony would have been helpful, and Defendant may even be right, the facts that counsel could conceivably have done more or that a particular trial strategy failed do not mean counsel's performance was deficient. *People v Petri*, 279 Mich App 407, 412; 760 NW2d 882 (2008). As such, counsel's decision to rely on cross-examination to impeach the witnesses identifying Defendant does not fall below an objective standard of reasonableness.

---

[4] "Double blind" is a scientific term referring to a manner of conducting a study in which neither the subjects *nor the experimenters* know which of multiple variables is which, generally accomplished by some kind of coding system and logged randomization that can be retrieved after the study is completed. The purpose of such "double blind" testing is, as defendant points out, to ensure that the experimenters' own perceptions and biases do not unconsciously affect the outcome of the test.

Consequently, seeking an alternative instruction would have been inconsistent with counsel's strategy. In any event, defendant urges the adoption of an instruction based on authorities not binding in Michigan, and trial counsel is generally not ineffective for failing to make a novel argument. *People v Reed*, 453 Mich 685, 695; 556 NW2d 858 (1996). To the extent defendant argues that counsel could have done better, it is difficult to conceive of a situation in which any trial attorney, with the benefit of hindsight and the luxury of ample time to reflect and ponder, could not find something in their performance that could have been improved upon. That is not the standard for assessing whether trial counsel was effective. Trial counsel's strategy was reasonable in light of Michigan law, and its ultimate failure is simply not relevant.[5]

Defendant next continues his argument in favor of a new and novel jury instruction regarding identification. As noted, the New Jersey Supreme Court found its then-current instructions on identification inadequate in light of scientific advances and a growing understanding of relevant neuroscience. *Henderson*, 27 A3d 872. Defendant also notes that after this decision in New Jersey, the State Bar of Michigan formed a task force to address this issue here. The First Circuit has also altered its identification instructions to inform jurors that scientific studies show "the reliability of an identification doesn't really depend upon how positive a person is." *United States v Jones*, 689 F3d 12, 17 (1st Cir 2012). Defendant also argues that the aiding and abetting instruction given was improper because it does not accurately reflect the law or does not apply to all aiding and abetting cases, on the theory that the case from which the instruction is derived, *People v Robinson*, 475 Mich 1, 14-15, 715 NW2d 44 (2006), is significantly distinguishable from the matter at bar and itself reflects an exception to the general rule of aiding and abetting instruction, as decided in a recent Supreme Court case, *Rosemond v United States*, ___ US ___; 134 S Ct 1240; 188 L Ed 2d 248 (2014).

Claims of instructional error are reviewed de novo. *People v Hall*, 249 Mich App 262, 269; 643 NW2d 253 (2002); lv den in part and remanded in part on other grounds 467 Mich 888 (2002). Jury instructions are reviewed as a whole to see if they sufficiently protected a defendant's rights. *People v Huffman*, 266 Mich App 354, 371-371; 702 NW2d 621 (2005). Even if the instructions are imperfect, there is no error if they fairly presented the issues to be tried and sufficiently protected the defendant's rights. *People v Milton*, 257 Mich App 467, 475; 668 NW2d 387 (2003).

We have already discussed why the standard jury instruction regarding identification was appropriate in the instant matter. Defendant distinguishes *Robinson* by asserting that the co-defendants in *Robinson* were friends, whereas there was no evidence here that defendant and King even knew each other. We find such an argument unavailing in the face of evidence that defendant *handed King an apparently loaded gun*. We find it highly unlikely that anyone would

---

[5] Our dissenting colleague has provided a thorough analysis and summary of the current state of scientific knowledge regarding eyewitness identification. We agree with the dissent's admission that our present jury instruction regarding eyewitness testimony remains the law. The Court of Appeals is an error-correcting court, and we are unpersuaded that it was erroneous for the trial court or defense counsel to follow the law.

simply hand over a gun to a complete stranger during a group confrontation, and even if someone did, it would reflect the most colossal and egregious disregard for the predictable result of that gun being discharged at another person. In *Robinson*, our Supreme Court reiterated that the necessary intent for second-degree murder is "the intent to kill, the intent to inflict great bodily harm, or the willful and wanton disregard for whether death will result." *Robinson*, 475 Mich at 14. The Court upheld the standard of aiding and abetting "that the charged offense was a natural and probable consequence of the commission of the intended offense." *Id*. at 15. To the extent *Rosemond* held otherwise, it limited its analysis to prosecutions for a particular statutory federal offense, which is of no relevance here. See *Rosemond*, ___ US at ___; 134 S Ct at 1245. The aiding and abetting instruction given may be less than ideal, but we are constrained to follow *Robinson* and therefore cannot find error in the reading of that instruction.

Defendant next argues that the prosecutor committed misconduct and denied him a fair trial when he told the jury that it could convict him based on a team theory of guilt, because the prosecutor asked for sympathy for the deceased, argued facts not in evidence, used inflammatory and religious arguments, denigrated defense counsel, and misstated the law. A general claim that the defendant was denied his or her due process right to a fair trial is a claim of nonconstitutional error, and defendant has not asserted that a specific constitutional right was violated. See *People v Blackmon*, 280 Mich App 253, 261-262, 269; 761 NW2d 172 (2008). Consequently, even if the prosecutor committed an error, we would only reverse if it appears more likely than not that the error was outcome determinative. *People v Brownridge*, 237 Mich App 210, 216; 602 NW2d 584 (1999).

Defendant argues that the prosecutor not only denied him a fair trial by comparing his criminal culpability through aiding and abetting to teamwork, but that when coupled with the jury instruction, the burden of proof was shifted to him. We disagree. The prosecutor's references to the way in which all members of a sports team share in the team's victory was obviously a metaphor. Importantly, the trial court clearly instructed the jury that the arguments of counsel were not evidence. Unlike the instruction in *Sandstrom v Montana*, 442 US 510, 512, 524; 99 S Ct 2450; 61 L Ed 2d 39 (1979), which impermissibly specified a presumption of intent, the instruction given here explicitly charged the jury with assessing whether defendant had any such intent, and that defendant could not be "merely present". The prosecutor need not speak in the "blandest of all possible terms." See *People v Cowell*, 44 Mich App 623, 628-629; 205 NW2d 600 (1973). We find no error here.

Defendant next argues that the prosecutor impermissibly asked for sympathy for the deceased. While the prosecutor's imagery of "transporting this young college student, this Wayne State University football player, into a piece of meat sitting on a slab" is somewhat grisly, we do not think it exceeds the bounds of permissibility. The prosecutor's argument that Knott's lack of cooperation with authorities was due to Knott's perception that "snitches end up in ditches" was a reasonable circumstantial inference, one that the jury may have made on its own. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995).

The prosecutor's use of a Biblical quotation *could* have appealed to jurors' sense of religious duties, but in context, the quotation was merely a somewhat hyperbolic reference to the deceased victim as someone who had attempted to make peace that evening. It was not a reference to any religious beliefs per se, *People v Jones*, 82 Mich App 510; 267 NW2d 433

(1978), and it did not call upon the jurors to convict on the basis of a religious duty. *People v Rohn*, 98 Mich App 593, 597; 296 NW2d 315 (1980), overruled in part on other grounds in *People v Perry*, 460 Mich 55, 64-65; 594 NW2d 477 (1999). There is no impropriety in merely making reference to a story from the Bible that the prosecutor may reasonably presume the jurors, irrespective of their individual religious beliefs or affiliations, will likely find familiar. *People v Mischley*, 164 Mich App 478, 482-483; 417 NW2d 537 (1987).

The prosecutor's reference to Mosley as a "red herring" was not improper denigration of defense counsel, but rather a fair argument regarding what the jury should believe. Finally, the prosecutor's statement that "the law permits conviction on adequate identification testimony alone . . . as long as it proves beyond a reasonable doubt that the defendant was the person who committed the crime" does not misstate the law. We do not find any misconduct or deprivation of a fair trial.

Defendant next argues that the evidence was insufficient to support his convictions. He concedes that the evidence was sufficient for the jury to find that he displayed the gun, fired it into the ground, and handed it to King. However, he contends, partially in reliance on his argument, addressed and rejected above, that the jury was improperly instructed, that this evidence is not enough to prove him beyond a reasonable doubt to have aided and abetted second degree murder. We disagree.

Evidence is sufficient if, when viewed in light most favorable to the prosecution, "a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Hampton*, 407 Mich 354, 368, 285 NW2d 284 (1979). "Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime." *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999) (internal quotation omitted). "Juries, and not appellate courts, hear the testimony of witnesses; therefore, we defer to the credibility assessments made by a jury." *People v Palmer*, 392 Mich 370, 376; 220 NW2d 393 (1974). "It is for the trier of fact . . . to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428, 646 NW2d 158 (2002). Consequently, we resolve all conflicts in the evidence in favor of the prosecution. *People v Kanaan*, 278 Mich App 594; 619, 751 NW2d 57 (2008).

The elements of assault with intent to do great bodily harm less than murder are: "(1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder." *People v Parcha*, 227 Mich App 236, 239; 575 NW2d 316 (1997). This Court has defined the intent to do great bodily harm as "an intent to do serious injury of an aggravated nature." *People v Mitchell*, 149 Mich App 36, 39; 385 NW2d 717 (1986). Second-degree murder is any kind of murder not otherwise specified. MCL 750.317. It is well-established that "second-degree murder is first-degree murder *minus* premeditation." *People v Carter*, 395 Mich 434, 438; 236 NW2d 500 (1975). To aid and abet the commission of a crime, the crime itself must be proven, and the defendant must have rendered some kind of assistance or encouragement to the commission of that crime with the intent that the crime occur or the knowledge that the principal intended for the crime to occur. *People v Moore*, 470 Mich 56, 63; 679 NW2d 41 (2004); *Carines*, 460 Mich at 757.

Defendant contends that because he fired into the ground, and Spearman was only incidentally injured by a ricochet, he could not have had the requisite intent to cause great bodily harm. We disagree. It can be reasonably inferred that defendant's flashing of the gun was a threat of force and that by passing the gun to King upon a request during a confrontation that had already become violent that defendant intended to do at least great bodily harm less than murder to someone in the group. Indeed, it is exceedingly difficult to imagine a scenario under which a person who is not him- or herself being directly threatened making *any* use of a loaded gun without, at minimum, a serious disregard for safety. Merely pointing a loaded gun at another person is inherently dangerous; the notion that *actually shooting a gun* in the direction of another person, no matter how inaccurately, could reflect anything but an intent to cause serious harm is beyond comprehension.

We also disagree with defendant's contention that the evidence was insufficient to find him guilty of aiding and abetting second-degree murder. King was convicted of first-degree murder. The passing of the gun unambiguously rendered assistance to the commission of that crime, and indeed was an indispensable part of the crime. We reject defendant's contention that he was unaware of what King intended to do with the gun or did not intend the gun to be used in the way that King used it. There are a limited number of conceivable reasons why an angry individual presently involved in a violent confrontation might demand that a gun be handed to him, and most of them tend not to end in the gun going unused afterwards. There are, likewise, a limited number of conceivable ways in which a loaded gun can be used. The overwhelmingly likely inference is that defendant either knew that King intended to discharge the gun or intended for King to discharge the gun. Consequently, we find that the evidence is sufficient to support defendant's convictions.[6]

Defendant's final argument regarding his convictions that he is entitled to a new trial on the basis of allegedly newly-discovered evidence from Todd regarding Mosley's alleged involvement in the crimes. Defendant contends that the evidence provided by Todd will prove the following: (1) Todd met Mosley at the Wayne County Jail; (2) Mosley admitted to Todd that he, not King, killed the football player from Wayne State; (3) Mosley told Todd that defendant was not involved; and (4) Mosley told Todd that defendant never passed Mosley the gun.

"Historically, Michigan courts have been reluctant to grant new trials on the basis of newly discovered evidence." *People v Grissom*, 492 Mich 296, 312; 821 NW2d 50 (2012). This policy is consistent with requiring parties to "use care, diligence, and vigilance in securing and presenting evidence." *Id*. When determining whether a new trial may be granted because of newly discovered evidence, "defendant must show that (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial." *People v Cress*, 468 Mich 678, 692; 664 NW2d 174, 182 (2003) (internal quotations to *People v Johnson*, 451 Mich 115, 118 n 6, 545 NW2d 637 (1996) omitted); MCR 6.508(D). The trial court found that the

---

[6] Defendant's felony-firearm charge is derivative of the other charges.

fourth requirement, the probability of a different result on retrial, had not been satisfied; consequently, the trial court impliedly found the other factors satisfied. We review the trial court's findings of fact for clear error, MCR 2.613(C), and its decision for an abuse of discretion. *People v Lemmon*, 456 Mich 625, 648 n 27; 576 NW2d 129 (1998).

We note first that Todd's testimony is to some extent corroborated by an official report that Mosley actually attempted to confess to a murder while in jail. However, it is undermined to an equal extent by the fact that it appears that nothing came of that purported confession. The fact that Mosley made a clear and obvious statement against his own penal interest by stating that he was responsible for "the Wayne State Murder" and "was the person that grabbed the gun" and "shot him" tends to exonerate King, but to the extent Mosley also stated that defendant was uninvolved, this testimony would also exonerate defendant. Furthermore, Mosley's awareness that the altercation that resulted in the murder began because "somebody pissed on something" suggests more than casual knowledge of the circumstances of the case. However, again undermining the testimony, Todd said this admission came up because everyone was calling Moseley a snitch in jail because he may have leaked information about the Wayne State murders, but Moseley told them that "I can't be a snitch against myself," implying that he committed the murders. The circumstances therefore suggest that it was strongly to Mosley's immediate benefit to claim to be a murderer rather than a snitch. We note also that the eyewitnesses were shown photographs of Mosley and denied that he was the shooter, and the jury reviewed photographs of Mosley, defendant, and King.

On its face, the proffered evidence is highly equivocal. Todd testified at this hearing, where the trial court had a better opportunity than this court to observe and evaluate his credibility. See *People v Canter*, 197 Mich App 550, 560-562; 496 NW2d 336 (1992). The clear error standard does not permit us to attempt to discover a "right" factual finding, but rather obligates us to defer to the trial court unless definitely and firmly convinced it made a mistake. See *Hill v City of Warren*, 276 Mich App 299, 308-309; 740 NW2d 706 (2007). The abuse of discretion standard is even more deferential and will be found only if the trial court's decision falls outside the range of principled outcomes. *People v Blackston*, 481 Mich 451, 467; 751 NW2d 408 (2008). If we cannot say with confidence that the record discloses a clear mistake or omissions that preclude meaningful review, and doubts we might have flowing solely from the question being close must be resolved in favor of leaving the trial court's decision untouched. See *McGonegal v McGonegal*, 46 Mich 66, 67; 8 NW 724 (1881). The extent to which the proffered evidence is persuasive is matched by the extent to which it is dubious. We are therefore unable to find that the trial court made a clear error or committed an abuse of discretion.

Lastly, defendant argues that the trial court improperly enhanced his sentence by scoring Offense Variable (OV) 5 at 15 points on the basis of facts not found by the jury, and that without the improperly considered evidence, it should be scored at zero points. The trial court commits plain error when it calculates an OV score "using facts beyond those found by the jury or admitted by the defendant" if that miscalculation "would change the applicable guidelines

minimum sentence range." *People v Lockridge*, 498 Mich 358, 399; 870 NW2d 502 (2015).[7] Defendant preserved this issue in the trial court, a scenario *Lockridge* predicted would be rare. *Id.* at 394. Defendant correctly states that OV 5 should be scored at either 15 or zero points depending on whether "serious psychological injury to the victim's family may require professional treatment," MCL 777.35, and the only evidence thereof was presented by the victim's family at sentencing. Consequently, OV 5 should have been scored at zero points, and the reduction of 15 points from defendant's total OV score, from 105 to 90, reduces his OV level from III to II. Because second-degree murder, MCL 750.317, is a Class M2 offense against a person, MCL 777.16p, this would reduce defendant's minimum sentence range from 315-525 months to 270-450 months. MCL 777.61.

Even though defendant's minimum sentence of 360 months lies within both the scored and the corrected minimum sentence ranges, because the sentence range itself has changed, our Supreme Court's historical interpretation of the sentencing guidelines would constrain us to vacate defendant's sentence and remand for resentencing. *People v Francisco*, 474 Mich 82, 91-92; 711 NW2d 44 (2006). However, in the wake of *Lockridge*, improperly calculated sentencing guidelines ranges are reviewed for harmlessness, which necessitates remanding for possible resentencing pursuant to *United States v Crosby*, 397 F3d 103 (CA 2, 2005), as described in *Lockridge*. See *People v Stokes*, ___ Mich App ___, ___; ___ NW2d ___ (2005) (Docket No. 321303, slip op at pp 8-12).

We affirm defendant's convictions, but we remand for possible resentencing pursuant to the *Crosby* procedure. We do not retain jurisdiction.

/s/ Amy Ronayne Krause
/s/ Kirsten Frank Kelly

---

[7] We are aware that elsewhere in the same opinion, our Supreme Court in *Lockridge* also stated "that trial courts must assess the 'highest number of points possible' to each variable, 'whether using judge-found facts or not.'" *People v Stokes*, ___ Mich App ___, ___; ___ NW2d ___ (2015) (Docket No. 321303, slip op at 7), quoting *Lockridge*, 498 Mich 392 and n 48. We find it difficult to reconcile that statement with the holding that sentencing guidelines are to be scored only on the basis of facts necessarily found by the jury or admitted by the defendant. However, in *Stokes*, we understand that this Court concluded that it could reconcile the disparate statements in *Lockridge* by determining that judges may score guidelines on the basis of facts they found independent of the jury or the defendant's admissions on the theory that doing so constitutes a departure, which now need only be justified as "reasonable." *Id*. Because we cannot state with confidence that any other interpretation of *Lockridge* is superior, we decline to declare a conflict with *Stokes*.