PEOPLE *v.* MILHEM.

1. HOMICIDE—MANSLAUGHTER—INSTRUCTIONS.
   Charge to jury that manslaughter is the unlawful killing of one human being by another; such as the intentional killing brought about by some great provocation and under the influence of passion and before the passions have had time to subside and reason to resume its normal course, *held,* proper, where defendant, charged with murder, was convicted of the manslaughter of her husband (CL 1948, § 750.316 *et seq.*).

2. CRIMINAL LAW—LESSER DEGREE OF AN OFFENSE—INSTRUCTIONS.
   A court must charge in relation to lesser degrees of an offense, where there is evidence which would tend to support conviction of a lesser degree (CL 1948, § 768.32).

---

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 26 Am Jur, Homicide § 554.
[3] 26 Am Jur, Homicide §§ 502, 572.
[4] 26 Am Jur, Homicide § 558.
[5] 3 Am Jur, Appeal and Error § 1053; 53 Am Jur, Trial § 90.

3. Homicide—Manslaughter—Evidence.

Evidence presented in prosecution of defendant for the murder of her husband *held*, to have presented sufficient basis for the jury's conviction of manslaughter, there being testimony of great provocation and a history of much turbulence during their marriage of 1-1/2 years (CL 1948, § 750.316 *et seq.*; § 768.32).

4. Same—Manslaughter—Instructions—Evidence.

Charge to jury in prosecution of defendant for the murder of her husband *held*, without reversible error, where it appears that evidence was sufficient to substantiate a charge of murder in the first degree, defendant was convicted of manslaughter and there was included in the charge a competent instruction upon the necessity of the jury to give defendant the benefit of any reasonable doubt (CL 1948, § 750.316 *et seq.*; §·768.32).

5. Criminal Law—Colloquy Between Court and Defendant's Counsel—Apology—Prejudice.

Colloquy between court and counsel during the course of a lengthy trial in prosecution for murder whereby trial court used offensive language toward defendant's counsel, but ordered it stricken from the record and apologized to the counsel before the jury, *held*, not to have constituted prejudicial error requiring reversal (CL 1948, § 750.316 *et seq.*).

Appeal from Recorder's Court for the City of Detroit; Schemanske (Frank G.), J. Submitted October 17, 1957. (Docket No. 68, Calendar No. 46,927.) Decided December 24, 1957. Rehearing denied March 4, 1958.

Sophie Milhem, charged with murder, was convicted of manslaughter. Affirmed.

*Thomas M. Kavanagh,* Attorney General, *Samuel J. Torina,* Solicitor General, *Samuel H. Olsen,* Prosecuting Attorney, *Samuel Brezner* and *Ronald J. Prebenda,* Assistant Prosecuting Attorneys, for the people.

*Porritt, Freud, Toppin & Louisell (Joseph W. Louisell* and *Ivan E. Barris,* of counsel), for defendant.

EDWARDS, J. Sophie Milhem was tried in the recorder's court of the city of Detroit on a charge of murder of her husband, Alexander Milhem, who throughout this record is known as Danny. The information filed in the case recited as follows:

"In the name of the people of the State of Michigan, Gerald K. O'Brien, prosecuting attorney in and for the county of Wayne, who prosecutes for and on behalf of the people of said State in said court, comes now here in said court in the May term thereof, A.D. 1955, and gives the said court to understand and be informed that Sophie Milhem, late of the said city of Detroit, in said county, heretofore, to-wit, on the 26th day of May, A.D. 1955, at the said city of Detroit, in the county aforesaid, feloniously, wilfully and of her malice aforethought, did kill and murder one Alexander Milhem; contrary to the form of the statute in such case made and provided, and against the peace and dignity of the people of the State of Michigan."

and was drawn under the statute pertaining to murder, CL 1948, § 750.316 *et seq.* (Stat Ann 1954 Rev § 28.548 *et seq.*).

At trial testimony was presented which could have substantiated a verdict of murder in the first degree. The trial judge in presenting the case to the jury also instructed the jury as to murder in the second degree and as to manslaughter, as well as justifiable and excusable homicide. His charge concluded:

"You may find the defendant guilty as charged; that is, guilty of murder in the first degree; or you may find her guilty of murder in the second degree; or you may find her guilty of manslaughter; or you may find her not guilty."

Defendant's counsel took exception to the portions of the charge having to do with manslaughter claim-

ing no competent testimony upon which a verdict of guilty of manslaughter could be found was contained in the evidence presented to the jury.

No prior request for instruction on this point had been submitted by defendant. The judge, in effect, overruled the objection. Jury brought in a verdict of guilty of manslaughter and the plaintiff was sentenced to serve 5 to 15 years.

On appeal to this Court the crucial question for our determination appears to be, Was there evidence to support the portion of the trial judge's charge which pertained to manslaughter and the jury verdict of manslaughter in this case? Our answer of necessity requires a recital of the facts. Etta Howard supplies one startling eyewitness view of what happened on May 26th:

"My name is Etta Howard. I live at 5026 Commonwealth. I was awake at 7 a.m. May 26, 1955. I was sitting in my window; I had just sat down to read the morning paper. I heard the shots but I didn't recognize them as shots. After I heard the noise of the shots, the car seemed to hesitate just slightly and then it came on slowly. It moved up in front of 5022. I could not estimate how many feet it moved up from the time that I first heard the shots. It would have passed my house and it was practically past the second house. It struck the car ahead of it. The right front tire was turned into the curb as it hit the other car. I continued to watch the automobile. I thought it was strange that no one got out of it for a few seconds. Then the door opened and this woman got out. Her purse dropped on the pavement. She picked it up, turned around and reached in and picked up the gun off the floor of the car. I saw the gun laying there and I saw her pick it up. She shut the door and ran across the corner of our lot and in between the 2 houses. The woman I saw is Sophie Milhem. She was hurrying."

At 7:12 a.m. a police officer in a scout car arrived at the scene in response to a call and found Danny Milhem behind the driver's seat in a 1953 Chevrolet with a bullet hole in his right cheek, bleeding profusely. He was still breathing.

Danny Milhem died at Receiving Hospital at 7:30 a.m. this same morning.

Also on the same morning at approximately 10 o'clock Sophie Milhem was found unconscious due to an overdose of barbiturates in the garage behind a house one block north of the scene of the shooting. Near her was a 25-caliber Colt automatic, an unloaded clip for the same, and additional undischarged shells.

Residual gunpowder was found by police tests on Sophie Milhem's right hand indicating, according to expert testimony, that the hand had been in close proximity to a gun when it was fired.

Concerning the gun, Detective Sergeant Leedle, attached to the scientific bureau of the Detroit police department, testified that it was a semiautomatic weapon with 2 safeties on it; that it took approximately 6–1/2 pounds of pressure to depress the trigger and 7 to 8 pounds to depress the backstrap on the weapon, or a total of 13 to 14 pounds of pressure to fire the gun. He testified further: "One cartridge fires every time the trigger is squeezed. To fire another cartridge you release the trigger and press again."

Sergeant Leedle also testified to examining the 1953 Chevrolet in which he found 6 bullet holes. He gave as his opinion concerning these bullets "That the line of flight was from the right side of the car to the left side, that is, from the passenger side of the car to the driver's side."

In or near the car an officer found 7 empty shell cases of a caliber designed for the weapon which has been described. There is no eyewitness testimony

other than that of defendant Sophie Milhem as to what actually took place in the car prior to the discharge of the shots which Etta Howard heard.

As might be anticipated there is, of course, much more to this story than what occurred on Commonwealth avenue at 7 a.m. on May 26, 1955. The record is replete with testimony pertaining to arguments and fights between Sophie and Danny Milhem during the course of the 1–1/2 years of their unhappy marital state.

As a portion of defendant's case, defendant's counsel sought to demonstrate by testimony that "the deceased was a quarrelsome, vicious person." There is testimony of one witness to an altercation between the two while they were driving in a car during which Danny repeatedly struck Sophie and finally threw her out of the car while it was still moving.

In still another episode Danny drove off in a car while Sophie was clinging to it with the ultimate result of her being slung into the mud and the police being called.

Many of the quarrels appear to have had as a basis Danny's undertaking to appropriate possessions or money which Sophie claimed as her own.

On cross-examination by counsel for defendant of one of the people's witnesses, Zella Jordan, who testified she was a friend of Sophie Milhem, the following episode was related:

"About 3 weeks before May 26th, in the vicinity of Sophie's flat on West Chicago boulevard, I remember an incident occurring. Danny was taking down some clothes and putting them in his 1949 Plymouth. He had an armful of clothes with him and he started to go back up and get some more clothes. They were separated at the time. They got into a tussle and an argument and he used terrible language and called her terrible names. A Barbara Wakin and Jeannie were also present. Jeannie got excited and called

the police at Petoskey [station]. Danny pushed Sophie and twisted her arm and when she got into the back seat of the car he hit her, pounded her and pulled her hair and took her foot and beat her injured leg. He was kicking her injured leg with his heel. I know that Sophie had a leg that was injured in an accident and that there was a 9-inch plate in there and that it was loose. The beating went on for 20 minutes to 1/2 hour before the police arrived and Danny and Sophie had a terrible scuffle in and out of the car. Danny was a bigger and stouter man than you. Sophie was saying 'Danny don't do that' and he was calling her terrible names.

"One of the policemen went upstairs with Danny and let him bring an armful of clothes down and put them in his car. Danny left, but he came back down the alley and Sophie ran over to him and he tried to run her over in the alley. He swerved the car towards her."

It appears also that during the last 3 weeks before Danny's death Danny had both threatened and attempted to leave Sophie and Sophie Milhem had been served papers in a suit for divorce approximately a week before Danny Milhem's death. There is testimony that at the time of receipt of the papers in the divorce proceeding Sophie Milhem thought that she was pregnant.

Witnesses identify Danny Milhem as a big, strongly built man.

Sophie Milhem bought the gun which has previously been described 3 days after receiving notice of the divorce proceeding. It was her testimony at trial that she bought it for target practice. The weapon was a snub-nosed semiautomatic which expert testimony identified as ill-suited to this purpose.

The record discloses Sophie Milhem's version of the night preceding the shooting. She had met Danny first at the Checker Cab garage where he worked and subsequently in the evening of the 25th

she had several phone conversations with him.
Shortly after midnight she picked him up in a car
at the Tiger Bar, and she testified that she brought
the gun with her at his request. She related various
episodes which occasioned their riding around
Wayne county most of the night. Early morning,
she said, found them parked on Commonwealth ave-
nue with the motor running. According to her ver-
sion he asked to see the gun and examined it and
loaded it. She testified that Danny then indicated
an intention to leave the automobile. The balance of
the story relevant to our case, we will record from
Sophie Milhem's testimony:

"*A*. Well, just as he was getting ready to go he
said, 'Well,'—just as he got ready to put it in his
pocket, the first thought that came to my mind, 'Is he
trying to take it?' and he must have read my mind,
because he said, 'Well, I think I will take this and
keep it for a while;' and I said 'Why?' 'Why do you
want to take everything I have got? It is mine and I
want it.' He said, 'I will take it until noon.' I said,
'By noon you could be far gone with it.' He made the
remark then, 'If you don't meet me I can see what it
would be worth at the pawn shop'—no, that isn't
what he said. He said, 'I wonder how much I could
get for it at the pawn shop,' and I said, 'Well, that is
beside the point.' I said, 'If you leave this car with
it, you won't be gone long because I will just report
it stolen to the police because'—before that he made
the remark that what was mine was his and vice
versa, and anything I had he could take; and I told
him that an attorney told me that once those papers
were at the attorney's office, that he couldn't take
anything of mine and that I could report anything
stolen. So, he told me to just go right on ahead. So,
that is when his hand was going for the door. So,
he wasn't expecting it, I guess, and I grabbed for it.
  "He was holding the gun in his left hand—no,
next to me, his right. I just grabbed it real quick
and moved back towards the door of the car. I

grabbed it with my right hand. I don't know how I grabbed for it; I just grabbed for it.

"*Q.* Now, Mrs. Milhem what is the next thing that you remember that happened?

"*A.* Well, the next—the next thing that happened was just as I—just as I grabbed it,—we were sitting kind of close and it seemed as if just as I took the gun from him he grabbed at me with his right hand, he grabbed my left hand; I remember him grabbing my left hand. So, I—I know that, that I was being stopped from moving towards getting out of the car, and then I figured that if I slid it in between the door of the car and the seat and moved over that way that he would have to get out to go around to move me, because I knew if I made up my mind I wasn't going to budge, he couldn't move me; and he put his one arm around my shoulder, and it seemed like he was getting ready to lock the door, do something to the door, and he came around with his other hand, and it just seemed like I was just in his grip like. I was on the passenger side at this time. I couldn't tell you too much about what happened, because it just seemed like there was a lot of noise in my head. There is parts of it when I can close my eyes and see just like it happened but I couldn't describe it. There is parts that I don't remember. After I grabbed for the gun I kind of had it in my right hand and I put my hand down. I put it down between the seat and the door and it was just then that I felt his arm around my shoulder and then I felt his other hand coming after my other hand, so I kind of moved over to the door a little more. Then I remember his hand grabbing for mine and my hand coming out from between the door and the seat. I remember the terrible grip on my wrist and him trying to shake it. He kept saying 'Drop that you fool, drop it.' He was just terrible mad. He told me didn't I know any better than that and said when he was taking something, he was taking it.

"I had never fired the gun before. I do not know right now whether I fired the gun at that time. I

cannot explain how the gun went off. I don't remember or recall separate shots going off. The next thing I remember is getting up off the seat. It seemed like I was lying down or in a lying position. My head was by the window like, by the corner of the door. My feet were on the floor and my head was by the right hand side. Danny was in back of the steering wheel and he was talking to me. He said, 'Didn't you know better than to try to take anything from me' and 'Crazy fool.' I next remember seeing the blood. It was all over me."

A neighbor on Commonwealth avenue testified that on hearing the shots and the crash she looked and saw "the form of a woman raising up from the floor on the right hand side of the car."

The prosecution in this case sought a first-degree murder conviction. It is obvious that there was testimony from which the jury could have found Sophie Milhem guilty of first-degree murder. This, however, they did not do and the question for this Court in this case is whether or not there was evidence which justified the judge's charge as to manslaughter and whether or not the evidence taken as a whole sustains the jury's manslaughter verdict. The recorder's court judge, before whom this case was tried, instructed the jury as follows as to the nature of manslaughter:

"Now, we come to the third degree of homicide, which is known as manslaughter. Manslaughter is the unlawful killing of one human being by another. It may be an intentional killing. The killer may intend to kill the deceased but it is brought about by some great provocation; that is, the killer has been excessively provoked and, as a result of such provocation and while under its spell, the accused kills the deceased. The killing must be done not only under great provocation in order to reduce the gravity of the offense to manslaughter, but it must have been done while still in the heat of passion and before

the passions have had time to subside and the blood
to cool. It must be done not only under great provo-
cation and under the influence of passion, but before
the passions have had time to subside and reason
to resume its normal course."

We believe this charge is entirely consistent with
the statute and with previous cases defining man-
slaughter handed down by this Court. In *People* v.
*Holmes,* 111 Mich 364, 369, 370, this Court said:

"It is true that under the law, as it has been
understood and administered in this State for many
years, the act of killing, though intentional, may be
committed under such circumstances as to make the
killing manslaughter, rather than murder. This oc-
curs when the act is committed in heat of blood,
produced by an adequate or reasonable provocation,
and before a reasonable time has elapsed for the
blood to cool and for reason to resume its habitual
control, and where the act is the result of temporary
excitement, by which the control of reason was dis-
turbed, rather than of any wickedness of heart, or
cruelty or recklessness of disposition. In such case
the law, out of indulgence to the frailty of human
nature, regards the offense as of a less heinous char-
acter than murder, and designates it manslaughter.
*People* v. *Scott,* 6 Mich 287, 295; *Maher* v. *People,*
10 Mich 212, 219 (81 Am Dec 781); *People* v. *Lilley,*
43 Mich 521, 526. But, in most cases, what consti-
tutes such provocation is necessarily and obviously a
question of fact. It must be such provocation as has
a natural tendency to produce such a state of mind
in ordinary men, and which the jury are satisfied did
produce it in the case in hand; and, equally, in
determining the length of time during which the
passions aroused by provocation may be recognized
in reducing the offense to manslaughter, the judg-
ment of the average jury is more trustworthy than
could be any precise rule laid down by the court.
*Maher* v. *People, supra.* See, also, *People* v. *Gar-
butt,* 17 Mich 9 (97 Am Dec 162). The question

must depend upon the nature of the accused and the laws of the human mind, as well as upon the nature and circumstances of the provocation."

See, also, 3 Gillespie, Michigan Criminal Law and Procedure (2d ed), § 1658. The general nature of this holding has been reiterated many times in subsequent cases. *People* v. *Droste,* 160 Mich 66; *People* v. *Bowen,* 165 Mich 231; *People* v. *Austin,* 221 Mich 635.

Our code of criminal procedure requires the court to charge in relation to lesser degrees of an offense where there is evidence which would tend to support conviction of a lesser degree.

"Upon an indictment for any offense, consisting of different degrees, as prescribed in this chapter, the jury may find the accused not guilty of the offense in the degree charged in the indictment and may find such accused person guilty of any degree of such offense, inferior to that charged in the indictment, or of an attempt to commit such offense." CL 1948, § 768.32 (Stat Ann 1954 Rev § 28.1055).

See, also, *People* v. *Abbott,* 97 Mich 484 (37 Am St Rep 360); *People* v. *Harvey,* 212 Mich 393; *People* v. *Guillett,* 342 Mich 1; *People* v. *Andrus,* 331 Mich 535.

In the last case cited, *Andrus, supra,* the general rule in regard to included offenses was discussed. Appellant argues that *Andrus* stands for the proposition that a lesser degree of a major offense must be the subject of jury charge even where there is *no evidence* to support the lesser degree. Appellant relies upon *People* v. *Schultz,* 267 Ill 147 (107 NE 833); and *State* v. *Punshon,* 124 Mo 448 (27 SW 1111), in arguing for a contrary holding.

We do not so read *Andrus.* Although the facts there were quite different than those presented by the instant case the court there plainly held that the

testimony was sufficient to warrant the manslaughter charge and verdict.

Nor do we find the *Schultz* or *Punshon Cases* authority for reversal in our current situation, since we find a great deal of evidence which tends to support the manslaughter verdict.

In this case the jury had before it ample evidence from which it could have found that Danny Milhem had, in his relations with his wife, exhibited a formidable and violent temper; that he had previously committed violent assaults upon her in the midst of their numerous quarrels. There was evidence from which they could have found that such a quarrel in relation to the possession of this gun took place in the automobile immediately prior to the shooting. While the fact that the car was still moving when the shots were fired, and that Danny was found behind the driver's wheel, might be argued strongly in the prosecutor's theory of first-degree murder rather than manslaughter, under the total record it does not seem to us conclusive evidence that Sophie Milhem was not, as she claimed, engaged in a sudden struggle with Danny over the gun. And there is ample prior history from which, when considered along with defendant's own testimony, the jury might have found a great provocation to intentional killing which served to reduce the degree of guilt from that of murder to manslaughter.

We note, of course, that defendant's primary argument is one of accidental discharge of the weapon. The undisputed fact of 7 separate shots from this semiautomatic weapon was undoubtedly in the jury's mind in rejecting the valid charge as to excusable or accidental death which the trial judge had presented to them.

We find no reversible error in the charge. It included a competent instruction upon the necessity for the jury to give the defendant the benefit of any

reasonable doubt. From our review of the evidence we cannot say that the jury failed to do so.

Defendant's last contention is that the court, in the course of the trial, and in the presence of the jury, committed prejudicial error by remarking to defendant's counsel, while admonishing him against carrying a glass of water around the courtroom, "This is not a barroom; you don't walk around with glasses."

We have had occasion to discuss at some length the trial court's responsibility for maintenance of an atmosphere of impartiality in the courtroom. *People v. Cole,* 349 Mich 175. The colloquies between court and counsel there complained of did not constitute reversible error according to our finding in that case, although we did regard them as undesirable.

We hold this colloquy to be of a similar classification. Lengthy criminal trials are not easy for either judge or counsel. The trial judge, on objection, in this instance struck the offensive language from the record and apologized to the counsel before the jury. We do not believe that this episode or any other disclosed to us in this record prejudiced the result of defendant's cause or constituted reversible error. Affirmed.

Dethmers, C. J., and Sharpe, Smith, Voelker, Kelly, Carr, and Black, JJ., concurred.