# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

SIGMUND FLOYD RUMPF,

        Defendant-Appellant.

UNPUBLISHED
January 30, 2018

No. 333544
Barry Circuit Court
LC No. 15-000620-FC

Before: MURPHY, P.J., and SAWYER and BECKERING, JJ.

PER CURIAM.

A jury convicted defendant, Sigmund Rumpf, of one count of manslaughter, MCL 750.321, one count of possession of a firearm when committing or attempting to commit a felony (felony-firearm), MCL 750.227b, and one count of carrying a concealed weapon, MCL 750.227. The trial court sentenced defendant to terms of imprisonment of 120-180 months for manslaughter, two years for felony-firearm, and two years for carrying a concealed weapon. Defendant appeals by right. We affirm defendant's convictions, but remand the matter to the trial court for resentencing.

## I. STATEMENT OF PERTINENT FACTS

Barry County Sheriff's Deputy Nicholas Seifert arrested defendant on July 21, 2015, for the same-day shooting death of Steven Kauffman, the boyfriend of defendant's friend, Morgan Wire. At the time of the killing, Wire had been dating Kauffman for a few weeks. At defendant's trial, Wire described Kauffman as a jealous boyfriend and said that if he saw her talking with another man, he automatically thought she was cheating on him. She testified that on the day of the shooting, she and Kauffman had driven to South Haven, drinking alcohol along the way. They continued drinking once they arrived at the pier, got into an argument, and headed back toward Kalamazoo, drinking and arguing along the way. Wire said that at one point, Kauffman yelled at her and hit her in the face. They pulled into a Speedway gas station outside Kalamazoo; as the Mountaineer slowly rolled to a stop, Wire was unlatching the seatbelt and opening the door when Kauffman pushed her out of the car and started to drive off. She fell out of the car and scraped her elbow. Kauffman made a U-turn, pulled back into the gas station lot, parked the car, got out, and walked around in an attempt to cool off. Wire testified that she then jumped into the SUV and drove away, leaving Kauffman at the gas station. Wire did not know where her phone was because things "had been thrown around in the car," so she went to

-1-

the bar in Delton where she worked and borrowed a friend's phone and Facebook account to message defendant. She asked him to go to her cottage on Pickerel Cove and get her dog before Kauffman tried anything, and told him that Kauffman had hit her and pushed her out of the car.

Defendant testified that on the day of the shooting, he had he and his brother planned to ride together to the Walldorf Brewpub and Bistro for team trivia night. His brother was going to drive, and defendant parked his Jeep under the carport at his parents' home, where he lived. He left a gun case containing his Remington 1911 tucked in the "gap between the backseat and the rear of the trunk" of his Jeep. Defendant testified that he had intended to take the gun to a local gun store earlier that day to have it fitted for Tritium night sights, but arrived at the store after it had closed. He left the gun case in the Jeep because he planned to take it to the gun store the following day. Defendant said that the gun was not loaded when he was driving around with it in his Jeep. Defendant recounted that as he and his brother were in the driveway getting ready to leave for team trivia at around 6:30 p.m., he began to get Facebook messages from a woman he did not know, but soon realized were from Wire. Defendant said he had met Wire three or four years prior, and for two or three months afterwards had been romantically interested in her. Defendant testified that when he got the messages, he thought Wire was in trouble and needed his help. He explained that he did not remove the gun case from its location in the Jeep before leaving his house for Wire's cottage.

Defendant was already at the cottage when Wire arrived. Wire testified that she grabbed her dog and a few possessions and planned to go to defendant's house. While she was at the cottage, Wire received a message from Kauffman's mother that said something about Kauffman coming to get his stuff, and that made her feel "kinda scared." As she was leaving, Wire walked by defendant's Jeep and saw an open gun case with a gun in it on the passenger seat. Wire admitted that, for a while, she did not tell deputies or the prosecutor about the gun, but eventually told one of the detectives on the case about it because she felt bad about lying. The two left Wire's cottage in separate vehicles, Wire in her white Mountaineer and defendant following in his yellow Jeep Wrangler. They drove toward Hastings, eventually turning onto Wildwood Road.

Wire and defendant offered conflicting testimony about what happened next. Wire testified that as they rounded a curve in the eastbound lane of Wildwood Road, she saw Kauffman driving "pretty fast" in the westbound lane in his mother's SUV. Shortly thereafter, she saw in her rearview mirror that Kauffman's SUV was coming up behind her and defendant. She pulled onto the shoulder of the road, intending to tell Kauffman where she had put the keys to his car, which was parked at the cottage. Kauffman pulled over behind her, and defendant pulled over a few car lengths behind Kauffman. Defendant testified that once they were on Wildwood Road driving east, he felt a jolt, as if he had hit a pothole, and saw what turned out to be Kauffman driving behind him in a silver SUV. Defendant said that the SUV approached on his left, and that when he looked over to see what was going on, he saw Kauffman leaning over the console with an angry expression on his face, looking at defendant as if defendant had done something wrong. Kauffman then cranked his steering wheel to the right, cutting into defendant, which caused defendant to crank his steering wheel to the right and run off the roadway. Defendant said that Kauffman then sped up toward Wire's car, and he saw both cars jolt at the same time, which made him think—although he could not say for sure—that the man had rear-ended Wire's car. According to defendant's account, only then did the two SUV's pull off to the

side of the road, Wire's in front and Kauffman's close behind. Wire testified that she did not see Kauffman's SUV pass or strike defendant's Jeep. Christine Gregory, a forensic scientist in the trace evidence unit at the Michigan State Police Lab, testified that she examined defendant's Jeep and the Toyota Forerunner Kauffman had been driving and did not find any evidence of damage to the rear end or spare tire of defendant's Jeep or evidence of the transfer of materials between the two vehicles.

Defendant testified that once the cars were on the side of the road, Kauffman walked toward Wire's car, yelling very loudly. By this time, defendant testified, he had figured out that the man was probably Wire's boyfriend and he was concerned for Wire. Defendant said that he got out of his car and yelled at Kauffman in order to draw his attention from Wire, upon which Kauffman turned and started yelling at him, at some point asking if defendant "was the one f****** Morgan" and stating that he was "gonna kick my f**** ass." Defendant said that this caused him some concern; he was not a person who got into fights, he had never been in a fight in his adult life, and he did not know how to defend himself with his hands. Defendant testified that Kauffman came at him, leaning forward with clenched fists, and that he was scared, so he got the gun case out of the back of his Jeep, thinking that the sight of the gun would diffuse the situation. Defendant recounted that he put one bullet in the magazine, but did not chamber the round, and stood by the open door of his Jeep with the gun pointed toward the ground, telling Kauffman to "cease and desist," that he had a gun, and that he would defend himself. Defendant said he learned to do this while on "fire watch" in the Marines; it was how one reacted when someone had breached the perimeter.

Defendant testified that Kauffman responded by charging him and throwing a punch with his right hand that hit defendant in the left side of the head. He said the punch made him feel concussed, and his vision faded; he was fearful, confused, and afraid that Kauffman was going to kill him. He testified that Kauffman knew he had a gun but charged him anyway, which made him think Kauffman was crazy and irate. Defendant pushed Kauffman as hard as he could, and Kauffman fell to the ground, and defendant backed up, again telling Kauffman to cease and desist and that he would defend himself. Kauffman charged him again, this time kicking him just below the ribs on his left side, and punching him in his right shoulder. Defendant pushed Kauffman again, but Kauffman did not fall down; at this point defendant chambered the round. When Kauffman came at him again, defendant backed up and leveled the gun at him. Kauffman stopped immediately and defendant recalled thinking that the situation had been resolved; he again told Kauffman to cease and desist, and said it was his final warning. According to defendant, Kauffman told him he was "too much of a p**** and he's gonna take the gun, shove it up my ass and kill me with it." Defendant said that he believed what Kauffman said and thought Kauffman was going to hurt him. When Kauffman ran toward defendant and lunged at him, defendant fired. Defendant testified that he had not wanted to pull the trigger and he felt fear of death as he pulled it; he was afraid that if Kauffman took the gun from him, he would be dead.[1]

---

[1] Wire did not recall seeing defendant outside his Jeep or the Jeep's door open. She said the two men yelled at each other a bit, and then she heard what she believed to be two gunshots. She

Defendant further testified that after approaching Kauffman's body and thinking him dead, he told Wire to call 911, forgetting that she did not have a phone, but Wire left the scene. Defendant said he went back to his Jeep and put the gun back in its case and the gun case back behind the seat, and started for home. Defendant's phone records indicate that he attempted to dial 911 at 7:40 p.m., but the call did not go through. Defendant testified that upon arriving at home, he parked his Jeep, put the gun case on a table in the garage, entered the house and used a landline to call 911; records show that the call went out at around 7:56 p.m. The prosecution played the 911 call for the jury, which heard defendant say that he had shot someone in self-defense and that Morgan Wire had been present at the scene. While he was on the phone with the 911 operator, defendant messaged Wire, stating " 'I called 911 so' t-a [sic, "ya"] 'know and don't tell anyone' " Defendant testified that he was feeling physically drained and ill when he returned home, and that the background noises audible on the 911-call are him vomiting. When the police arrived, defendant followed the instructions of the 911 operator and went outside with his hands in the air. He made contact with Deputy Seifert, whom he directed to the gun in the garage and voluntarily accompanied to the sheriff's department.

Deputy Seifert testified that he made contact with defendant at his house between 8:00 p.m. and 8:30 p.m., that he got a good look at defendant's face, and that he had no bruises, scratches, or marks of any kind, and his clothing was not ripped. He said that defendant accompanied him to the Sheriff's Department at around 8:30 p.m., and that he then took defendant to the hospital because defendant continued to vomit and reported that he had Crohn's disease. Seifert testified that while they were waiting to see a doctor, he had a conversation with defendant that was recorded on a pocket recorder that the deputy had activated on the way to defendant's house.[2] Seifert testified—and defendant affirmed under cross-examination—that defendant did not say that he was trying to save his life, that he feared for his life, that he thought he was going to be killed or seriously injured, or that he thought Kauffman had a weapon. He did not describe Kauffman as wild-eyed and deranged or that Kauffman said anything about sleeping with his girlfriend or threatened to "kick [defendant's] ass." Defendant did not describe how he put one bullet into the empty magazine of his pistol, say Kauffman had hit him so hard he could not see, that his head was swimming, or that Kauffman had hit him in the shoulder and kicked him in the ribs.[3] Seifert testified that this was the only time during the nearly four hours that he was with defendant that defendant talked about the shooting. Seifert acknowledged on cross-examination that defendant had appeared calm, pleasant, polite, and cooperative, and that

---

looked back and saw Kauffmann lying in the road. Wire said that she had the radio on in the car and was dividing her attention between the two men and her dog in the back seat, but the intervals between her looking back at the men were not long enough for her to have missed a fistfight.

[2] The trial court admitted into evidence an excerpt of the conversation during which defendant talked about the shooting.

[3] When describing the incident to Seibert, defendant stated that Kauffman "swung" and he "ducked" and backed up, but later in the conversation he commented, "My head hurts. Must – must have been from where he hit me."

defendant had answered every question Seifert had asked of him, and that he had not asked defendant about the details of the shooting, or about whether defendant had feared for his life.

## II. ANALYSIS

### A. MRE 404(B) EVIDENCE

Defendant contends that the trial court abused its discretion by excluding specific prior acts of the victim offered to show the victim's plan or scheme of getting drunk and becoming violent with men over issues related to women. Defendant contends that the prior acts were relevant to defendant's theory of self-defense because they showed that Kauffman was violent and was the initial aggressor. We disagree. We review a trial court's evidentiary decisions for an abuse of discretion. *People v Danto*, 249 Mich App 596, 598; 822 NW2d 600 (2011). "A trial court abuses its discretion when its decision falls outside the range of principled outcomes." *Id*. at 599.

Generally, "[e]vidence of other crimes, wrongs, or acts of an individual is inadmissible to prove a propensity to commit such acts." *People v Engelman*, 434 Mich 204, 211; 453 NW2d 656 (1990), citing MRE 404(a). However, other-acts evidence is admissible if offered for a proper purpose, relevant, and if the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993). A proper purpose is one that requires the factfinder to make an intermediate inference other than one about the person's character or criminal propensity. *Id*. at 87. Proper purposes include "proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case." MRE 404(b).

"[M]erely *reciting* a proper purpose does not actually demonstrate the *existence* of a proper purpose for the particular other-acts evidence at issue and does not automatically render the evidence admissible." *People v Denson*, 500 Mich 385, __; 902 NW2d 306, 316 (2017). To determine whether the recited purpose is simply a front for the improper admission of propensity evidence, courts must analyze the logical relevance of the evidence. *Id*. "Other-acts evidence is logically relevant if it is material and if it has probative value. *Id*. at 13. Evidence is material if it is related to "any fact that is of consequence" to the action. *People v Crawford*, 458 Mich 376, 388; 582 NW2d 785 (1998), citing MRE 401. Evidence has probative value if it tends to make the existence of a material fact "more probable or less probable than it would be without the evidence." *Crawford*, 458 Mich at 389-390. As previously indicated, proffered other-acts evidence must be probative of something *other* than "the character of a person in order to show that action in conformity therewith." MRE 404(b)(1). In addition, if the proponent of other-acts evidence bases the relevance of the evidence on the alleged similarity between the proposed prior acts and the conduct at issue, there must be a "striking similarity between the two acts to find the other act admissible." *Denson*, 500 Mich at __; 902 NW2d at 317 (internal quotation marks omitted).

In the instant case, defendant sought to admit specific acts from 2004, 2010, and 2015. In each case, Kauffman was intoxicated, or presumed to be intoxicated, when he acted aggressively

and violently toward allegedly unsuspecting men. In the 2004 incident, Kauffman punched the stepfather of his then-girlfriend in the face, causing the man to fall and hit his head. In the 2010 incident, Kauffman punched a man he saw talking to his then-girlfriend through her car window in the parking lot of a bar. In the 2015 incident, Kauffman punched through the storm door of a house and then punched and choked the male victim within. Defendant asserted that these incidents lent credence to his account of Kauffman acting aggressively and putting defendant in fear for his life, they were highly probative, and they were so blatantly similar to each other and to defendant's encounter with Kauffman that they should be admissible under MRE 404(b).

The trial court did not abuse its discretion by excluding the prior acts proposed by defendant. Defendant's contention that the proposed other-acts evidence is not a series of spontaneous acts, but evidence of a plan, scheme, or system is simply unconvincing. Other than their shared gender, defendant has not called attention to any similarities between the victims in the three proposed instances, or between them and defendant. Nor has he called attention to any similarities in motives or triggers between Kauffman's prior acts and the incident with defendant. As the prosecutor succinctly stated during the hearing on defendant's motion, getting drunk and beating up an unknown guy over a girl characterizes innumerable bar fights. What the proposed instances do show is what Wire and several witnesses testified to at defendant's trial: Kauffman's reputation for being a jealous boyfriend and a man known to be aggressive and violent, particularly when angry. The other acts championed by defendant are specific examples of Kauffman's propensity to aggression and, as such, are inadmissible under MRE 404.

Even if the court did abuse its discretion by excluding the proposed evidence, the error did not prejudice defendant because the jury heard several defense witnesses, as well as the prosecution's lead witness, Wire, testify to Kauffman's aggressiveness and propensity toward violence. Moreover, with regard to defendant's claim of self-defense, the question before the jury was whether defendant honestly and reasonably believed that he was in danger of being killed or seriously injured, and that shooting Kauffman was immediately necessary. See M Crim JI, 7.15. Defendant testified that, prior to the shooting, he had never even heard of Kauffman. Accordingly, Kauffman's prior acts could not have affected defendant's state of mind, and Kauffman's unknown intent was irrelevant to the jury's determination of whether defendant acted in self-defense. For all of these reasons, defendant's claim of error based on the trial court's exclusion of proposed other-acts evidence fails.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant raises two instances that he claims demonstrate the ineffective assistance of his trial counsel. He first contends that trial counsel rendered constitutionally ineffective assistance by allowing him to testify at trial. We disagree. Whether defense counsel performed ineffectively is a mixed question of law and fact. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). We review a trial court's factual findings for clear error and its constitutional determinations de novo. *Id.* Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *People v Seals*, 285 Mich App 1, 17; 776 NW2d 314 (2009). In the present case, this Court's review is limited to the facts contained in the record. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).

In order to establish ineffective assistance of counsel, defendant must show: (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Trakhtenberg*, 493 Mich at 51. Defendant contends that by allowing him to testify, trial counsel subjected him to impeachment with statements defendant made to Seifert regarding his prior military service and his alleged loss of romantic interest in Wire. Defendant contends that trial counsel performed below an objective standard of reasonableness by failing to analyze the discovery and to detect the potential impeachment material or by knowingly exposing him to harmful impeachment. Defendant asserts that having him testify had no strategic value and it was prejudicial because it undermined his credibility.

We first note that defendant does not assert on appeal that counsel or the trial court compelled him to testify in violation of the Fifth Amendment. US Const, Am V. Defense counsel has wide discretion as to matters of trial strategy. *Heft*, 299 Mich App at 83. This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight. *Id*. A defendant's decision to testify or not is a strategic decision best left to the defendant and his or her counsel. *People v Martin*, 150 Mich App 630, 640; 389 NW2d 713 (1986).

After reviewing the record, we conclude that contrary to defendant's assertion, his testimony did have strategic value because it provided the only source of information from which the jury could determine that defendant had acted in self-defense. In order to conclude that defendant killed Kauffman in lawful self-defense, the jury had to find that at the time defendant acted he "honestly and reasonably believed that he was in danger of being killed or seriously injured" and he "honestly and reasonably believed he needed to use deadly force in self-defense." M Crim JI 7.15. Although the 911 call shows that defendant said he shot a man in self-defense, Seifert testified that during the extended period of time he spent with defendant, defendant did not tell Seifert that he had feared for his life, thought Kauffman was going to kill or seriously injury him, or saw no escape but to shoot. Thus, it was only through counsel's direct examination of defendant that the jury heard evidence that Kauffman had physically attacked defendant and that defendant honestly believed Kauffman was going to kill him, that he never wanted to take the life of another human being, that he saw no other way out, and that he was very afraid.

In addition, it was defendant's direct examination testimony that provided the jury with the facts necessary to find defendant guilty of voluntary manslaughter instead of murder. As damaging as the cross-examination testimony may have been to defendant's claim of self-defense,[4] without defendant's direct examination testimony, the jury would not have heard

---

[4] Under the prosecution's cross-examination, defendant admitted that he could have gotten back in his Jeep or called 911 at several points instead of staying and engaging Kauffman, that he had had some self-defense training in the Marines, and that he did not shoot to incapacitate Kauffman, but to kill him.

anything about Kauffman's sudden attack, defendant's "passion and anger" during the attack, and the immediacy with which defendant acted, all factors necessary for a finding of voluntary manslaughter. See M Crim JI 16.5. Therefore, even if the prosecution's cross-examination did weaken defendant's claim of self-defense, without defendant's direct testimony, the testimony of the other witnesses at trial arguably would have been insufficient to enable the jury to determine that defendant committed manslaughter rather than murder. Thus, putting defendant on the stand was a necessary—and one might argue successful—strategic decision. Under these circumstances, we cannot say that trial counsel rendered constitutionally ineffective performance by having defendant testify.

Defendant next contends that his trial counsel was ineffective for failing to bring to the trial court's attention that defendant saw jurors in the parking lot as police were leading him to a police vehicle and for failing to move for a *Ginther* hearing[5] to develop the record with regard to the incident. Again, we disagree.

"Freedom from shackling is an important component of a fair trial." *People v Dixon*, 217 Mich App 400, 404; 552 NW2d 663 (1996). However, "the prohibition against shackling does not extend to safety precautions taken by officers while transporting a defendant to and from the courtroom." *People v Horn*, 279 Mich App 31, 37; 755 NW2d 212 (2008). When jurors briefly and inadvertently see a defendant in shackles, "there must still be some showing that the defendant was prejudiced." *Id*; see *People v Moore*, 164 Mich App 378, 384-385; 417 NW2d 508 (1987), mod on other grounds 433 Mich 851 (1989) (finding no error because defendant had not established prejudice from jurors having caught a brief and inadvertent view of defendant in handcuffs while deputies were returning him to the courtroom after a recess).

Defendant does not claim that the jurors he saw in the parking lot while being escorted to a police car also saw him. Even assuming for the sake of argument that they did, defendant nevertheless has failed to make the requisite showing of prejudice. *Horn*, 279 Mich App at 37. Defendant speculates on appeal that the incident undermined the presumption of innocence and harmed his credibility. However, mere speculation is insufficient to establish actual and substantial prejudice that affected the outcome of defendant's trial. See *People v Woolfolk*, 304 Mich App 450, 454; 848 NW2d 169 (2014). Further, the trial court instructed the jury that it had to start with the presumption that defendant was innocent, maintain that presumption throughout the trial, and, unless satisfied beyond a reasonable doubt that he was guilty of the charges against him, return a verdict of not guilty. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). In addition, the fact that the jury found defendant sufficiently credible to find him guilty of voluntary manslaughter and not murder suggests that the incident was not prejudicial to defendant's credibility. In light of this, we cannot say that trial counsel's failure to

---

[5] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

report the incident and to request a *Ginther* hearing constituted performance below an objective level of reasonableness.[6]

## C. JURY INSTRUCTION

Defendant argues that the trial court erred by reading potentially confusing instructions to the jury. We disagree. We review a claim of instructional error involving a question of law de novo, but review "the trial court's determination that a jury instruction applies to the facts of the case for an abuse of discretion." *People v Everett*, 318 Mich App 511, 528; 899 NW2d 94 (2017) (quotation marks and citation omitted). The Court reviews jury instructions as a whole to see if they sufficiently protect a defendant's rights. *People v Huffman*, 266 Mich App 354, 371-372; 702 NW2d 621 (2005). Even if imperfect, there is no error if the instructions "fairly presented the issues to be tried and sufficiently protected the defendant's rights." *People v Blevins*, 314 Mich App 339, 353; 886 NW2d 456 (2016).

In order to convict defendant of carrying a concealed weapon in a vehicle, the prosecution had to prove beyond a reasonable doubt that a pistol was in the vehicle, that defendant knew the pistol was there, and that defendant took part in carrying or keeping the pistol there. M Crim JI 11.1. The law does not apply to a person who carries for a lawful purpose a licensed, completely unloaded pistol in a closed firearm storage case or container that is not easily accessible to people in the vehicle. M Crim JI 11.14. The trial court read these two instructions to the jury. Over defendant's objection, the trial court also read M Crim JI 11.3, which defines a pistol and states in part, "it does not matter whether or not the pistol is unloaded." Counsel objected to including M Crim JI 11.3 on the ground that its inclusion likely would introduce confusion into the jury's consideration of the exemption because the definition of "pistol" said that it did not matter whether the pistol was loaded or unloaded, but in order for the exemption to apply, the pistol had to be completely unloaded.

On appeal, defendant fails to point to any actual confusion on the jury's part. Arguably, the trial court abused its discretion by determining that M Crim 11.3 applied where there was no dispute that defendant had a pistol in his vehicle. The record reveals no dispute regarding whether the weapon used was a pistol, and the use note in M Crim JI 11.1 states that M Crim JI 11.3 "should be included in the instructions only where there is some question of the article being a pistol." Nevertheless, even if the trial court's instructions were imperfect, there is no error if the instructions "fairly presented the issues to be tried and sufficiently protected the defendant's rights." *Blevins*, 314 Mich App at 353. Defendant has provided no argument as to how including M Crim JI 11.3 undermined a fair presentation of the issues and insufficiently protected his rights, and no record evidence suggests that the instructions did not sufficiently

---

[6] Defendant also contends that the trial court erred in denying his post-trial motion for a *Ginther* hearing to develop the record relative to defendant's potentially being seen by jurors "in restraints or being escorted by multiple officers into a squad car," and to the decision to have defendant testify. In light of our conclusion that trial counsel did not render constitutionally ineffective assistance with regard to these two issues, we likewise conclude that the trial court did not abuse its discretion by denying defendant's post-trial request for a *Ginther* hearing.

protect defendant's rights. *Huffman*, 266 Mich App at 371-372. The trial court gave the jury a written copy of the instructions to reference while deliberating and, in our view, a fair reading of the instructions leaves no room for confusion. In light of this, we conclude that the trial court's instructions to the jury fairly presented the issues to be tried and that defendant has not shown prejudice or entitlement to relief.

## D. SENTENCING ISSUES

### 1. OV 19

Defendant contends that the trial court erred in scoring 10 points for offense variable (OV) 19. We agree. "Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "A finding is clearly erroneous if this Court is left with the definite and firm conviction that a mistake has been made." *People v Lee*, 314 Mich App 266, 272; 886 NW2d 185 (2016) (quotation marks and citation omitted). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation which [this Court] reviews de novo." *Hardy*, 494 Mich at 438.

Offense variable 19 addresses a threat to the security of a penal institution or an interference with the administration of justice or the rendering of emergency services. MCL 777.49(1). In the present case, the trial court scored defendant 10 points under OV 19 for "interference with the administration of justice." This Court has previously consulted dictionary definitions of "interfere" to discern what the Legislature intended by the phrase "interfere[] with the administration of justice." *People v Hershey*, 303 Mich App 330, 342-343; 844 NW2d 127 (2013). The plain and ordinary meaning of "to interfere" is " 'to come into opposition or collision so as to hamper, hinder, or obstruct someone or something[.]' " *Id*., quoting *Random House Webster's College Dictionary* (2005). This implies some sort of uncooperative action on the part of the defendant. Accordingly, the cases where this Court has affirmed scoring 10 points for OV 19 typically involve unequivocal acts by the defendant, not ambiguous acts or acts of omission. For example, "[t]his Court has held that 10 points were properly assessed under OV 19 against a defendant who refused to pull his car over when a police officer activated his vehicle's lights and sirens and instead attempted to escape, first by car and then on foot." *People v Ratcliff*, 299 Mich App 625, 632; 831 NW2d 474, vacated in part on other grounds, app dis, 495 Mich 876 (2013), citing *People v Cook*, 254 Mich App 635, 637, 639-641; 658 NW2d 184 (2003), overruled in part on other grounds, *People v McGraw*, 484 Mich 120, 133; 771 NW2d 655 (2009). See also *People v Barbee*, 470 Mich 283, 288; 681 NW2d 348 (2004) (OV 19 properly scored where the defendant gave his brother's name to an officer making a traffic stop); *People v Ericksen*, 288 Mich App 192, 203-204; 793 NW2d 120 (2010) (OV 19 properly scored where the defendant left the scene of the crime (and the state), attempted to hide the weapon, and asked others to lie about his whereabouts).

The prosecution argues on appeal that the trial court properly scored OV 19 where defendant said to Wire, "don't tell anyone." The record shows that defendant made the statement to Wire while he was on the phone with 911 explaining that he had just shot someone and that Wire had been present at the scene. In light of this, it seems unlikely that defendant was

instructing Wire not to talk to the police. Under the circumstances, it seems just as likely that defendant was telling Wire not to tell anyone among their acquaintance what had happened. Moreover, the record shows that defendant also told Deputy Seifert that he shot Kauffman and that Wire had been present. In light of the record evidence of defendant's forthcoming explanations and admissions, it is not at all clear that he was urging Wire not to talk to the police; "don't tell anyone," in the context in which defendant uttered it, is simply too ambiguous to constitute evidence of interference with the administration of justice.

The prosecution also argues that scoring 10 points for OV 19 was proper because defendant interfered with the administration of justice by omitting information that might have been helpful to law enforcement. Specifically, defendant did not tell the 911 operator that he was messaging Wire simultaneously. There is no record evidence that defendant was aware that law enforcement wanted this information, or that the information would have been helpful to law enforcement, particularly after defendant had given the 911 operator Wire's name, said she was at the scene of the killing, and truthfully said he was able to contact her only through Facebook. Not telling the 911 operator that you were Facebook messaging with someone whose name and significance to the matter you had already provided seems qualitatively different from purposely fleeing the scene of a crime, giving someone a false name, attempting to hide a weapon, or telling others to lie about your whereabouts. Moreover, Seifert testified that defendant was very cooperative and answered every question the deputy asked of him, despite the fact that defendant was physically sick. If defendant acted in a way that interfered with the administration of justice, there is no record evidence that the testifying law enforcement personnel noticed it.

To summarize, the meaning of defendant's statement to Wire instructing her not to tell anyone is ambiguous in the context of his telling the police about Wire as a witness who was at the scene, and defendant's particular omission is not the type of activity typically associated with interfering with the administration of justice. In light of this, and given the testimony from Deputy Seifert that defendant cooperated fully, we conclude that a preponderance of the evidence does not support a finding that defendant interfered with the administration of justice. Therefore, the trial court erred in scoring 10 points for OV 19.

## 2. DEPARTURE SENTENCE

Defendant also contends that the trial court erred by substantially departing upward from the sentencing guidelines without making findings regarding the degree or extent of the departure and whether the sentence was proportionate to the offense and the offender. Again, we agree. We review for reasonableness a trial court's decision to depart from the applicable sentencing guidelines. *People v Steanhouse (On Remand)*, __ Mich App __, __; __ NW2d __ (Issued December 5, 2017, Docket No. 318329) (*Steanhouse III*), slip op at 2. "When reviewing a departure sentence for reasonableness, [the Court] must review 'whether the trial court abused its discretion by violating the principle of proportionality set forth' in *Milbourn*." *Id.*, citing *People v Steanhouse*, 500 Mich 453, 477; 902 NW2d 327 (2017) (*Steanhouse II*). "A trial court abuses its discretion if it violates the principle of proportionality test 'by failing to provide adequate reasons for the extent of the departure sentence imposed . . . .' " *Steanhouse III*, __ Mich App at __; slip op at 3, quoting *Steanhouse II*, 500 Mich at 476.

In *Steanhouse II*, the Michigan Supreme Court held that the proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the principle of proportionality set forth in *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990). As this Court recently explained in *Steanhouse III*:

> Under the principle of proportionality standard, a sentence must be "proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Milbourn*, 435 Mich at 636. As such, the sentencing court must impose a sentence that takes "into account the nature of the offense and the background of the offender." *Id.* at 651. Generally, sentences falling within the minimum sentencing guidelines range are presumptively proportionate. *People v Cotton*, 209 Mich App 82, 85; 530 NW2d 495 (1995). However, a departure sentence may be imposed when the trial court determines that "the recommended range under the guidelines is disproportionate, in either direction, to the seriousness of the crime." *Milbourn*, 435 Mich at 657. Factors that may be considered under the principle of proportionality standard include, but are not limited to:
>
> > (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [*People v Lawhorn*, __ Mich App __, __; __ NW2d __ (2017) (Docket No. 330878; slip op at 7 (citation and quotation marks omitted).]
>
> An appellate court must evaluate whether reasons exist to depart from the sentencing guidelines and whether the *extent* of the departure can satisfy the principle of proportionality. *Milbourn*, 435 Mich at 659-660 (recognizing that "[e]ven where some departure appears to be appropriate, the extent of the departure (rather than the fact of the departure itself) may embody a violation of the principle of proportionality"). Therefore, even if [sic] cases where reasons exist to justify a departure sentence, the trial court's articulation of the reasons for imposing a departure sentence must explain how the extent of the departure is proportionate to the seriousness of the circumstances surrounding the offense and the offender. See *People v Smith*, 482 Mich 292, 304; 754 NW2d 284 (2008) ("When departing, the trial court must explain why the sentence imposed is more proportionate than a sentence within the guidelines recommendation would have been."). [*Steanhouse III*, __ Mich App at __; slip op at 2-3.]

The first step in the reasonableness review is to determine whether there were " 'circumstances that are not adequately embodied within the variables used to score the guidelines.' " *Steanhouse III*, __ Mich App at __; slip op at 3, quoting *Milbourn*, 435 Mich at 659-660. Such analysis requires comparing "the stated reasons for exceeding the guidelines with the scored offense variables (OVs) to determine whether those reasons were already encompassed within the guidelines." *Steanhouse III*, __ Mich App at __; slip op at 3. The

-12-

relevant inquiry is "whether the trial court abused its discretion by imposing a departure sentence without articulating whether the guidelines adequately took into account the conduct alleged to support the particular departure imposed." *Id*.

In the present case, defendant's prior record variable (PRV) score was 22. Defendant was scored two points for PRV 5, (for one prior misdemeanor conviction) and 20 points for PRV 7 (for two or more subsequent or concurrent felony convictions).[7] Defendant's total OV score was 50. These scores put defendant at PRV level C and OV level V, which called for a minimum sentence of 36 months and a maximum for a first-time offender of 71 months. The trial court sentenced defendant to 120 to 180 months in prison (180 months is the statutory maximum for manslaughter). In imposing its sentence, the trial court considered the following factors: (1) defendant's lack of remorse; (2) that he took a gun with him knowing he might have to use it; (3) that, given his military training, he could have incapacitated Kauffman, but he intended to kill Kauffman when he shot him; (4) the psychological injury to the family; (5) that defendant left the scene after the shooting, and (6) that he tried to control and manipulate the situation by not telling police he was in contact with Wire and by telling her not to tell anyone. It is not clear, however, whether the trial court considered all of the foregoing as reasons for imposing a departure sentence.

Defendant's lack of remorse is a valid reason to depart because the sentencing guidelines do not account for it. *Lawhorn*, __ Mich App at__; slip op at 7.

Offense Variable 2 accounts for the possession of a lethal weapon. Five points may be scored where "[t]he offender possessed or used a pistol, rifle, shotgun, or knife or other cutting or stabbing weapon." MCL 777.32(1)(d) . Defendant admitted that he shot Kauffman with a pistol; thus, OV 2 was properly scored at 5 points. Unless the guidelines inadequately accounted for defendant's possession and use of a pistol, this stated reason for imposing a departure sentence was improper. *Steanhouse III*, __ Mich App at __; slip op at 5. The trial court did not explain whether or why the scoring of OV 2 at 5 points was inadequate.

The trial court also considered that, given his military training, defendant arguably could have shot Kauffman in a way that incapacitated him; instead, he fired a "kill shot." OV 1 accounts for the aggravated use of a weapon, and was scored at 25 points because "[a] firearm was discharged at or toward a human being . . . ." MCL 777.31(1)(a). OV 6 accounts for an offender's intent to kill or injure another individual, and is scored at 10 points where "[t]he offender had intent to injure or the killing was committed in an extreme emotional state caused by an adequate provocation and before a reasonable amount of time elapsed for the offender to calm down . . .." MCL 777.36(1)(c). Scoring OV 6 at 10 points was consistent with the jury's verdict that defendant was guilty of voluntary manslaughter as a lesser included offense to

---

[7] While a Sentencing Information Report (SIR) exists and contains scores for PRVs and OVs, it is not signed by the sentencing judge. The only contested scoring at defendant's sentencing was with respect to OV 19. While it appears that the trial court implicitly accepted the other scoring recommendations of the Department of Corrections, it is possible that the trial court did not undertake its own scoring assessments.

murder. See M Crim JI 16.9. OV 1 accounts for defendant's discharging a firearm at Kauffman, and OV 6 accounts for the circumstances in which the fatal shot was taken. Again, unless the guidelines inadequately accounted for defendant's firing a weapon at Kauffman "in an extreme emotional state caused by an adequate provocation[,]" this was not a proper reason to impose a departure sentence. *Steanhouse III*, __ Mich App at __; slip op at 5. The trial court did not explain whether or why the scoring of OV 1 at 25 points and OV 6 at 10 points was inadequate.

The trial court identified "psychological injury to the family" as one of the factors "not scored in the guidelines."[8] OV 5 may be scored a maximum 15 points where there is serious psychological injury requiring professional treatment that occurred to a victim's family. MCL 777.35(1)(a). The instructions for scoring OV 5 state that it may be scored "only if the sentencing offense is homicide, attempted homicide, conspiracy or solicitation to commit a homicide, or . . . assault with intent to commit murder." The instructions further state, "[a]ny crime in which the death of a human being is an element of the crime is a 'homicide.' " MCL 777.1(C). The jury convicted defendant of voluntary manslaughter as a lesser-included offense of murder, and its elements include the death of a human being. See M Crim JI 16.9; *People v Milhem*, 350 Mich 497, 507; 87 NW2d 151 (1957). Therefore, the trial court could have scored OV 5 at 15 points, but doing so would not have changed defendant's OV level or sentencing grid.

Another factor the trial court considered was defendant's alleged attempt to control or manipulate the situation by withholding from the police that he was in contact with Wire and by saying to Wire, "don't tell anyone." As already indicated, the trial court assessed defendant 10 points for OV 19 for interfering or attempting to interfere with the administration of justice other than by using force or threats. MCL 777.49(c). However, for reasons stated earlier in this opinion, we conclude that the trial court erred in scoring OV 19.

In sum, of the six reasons given by the trial court for imposing a departure sentence, OV 2 accounts for the fact that defendant took a gun with him, and OVs 1 and 6 account for the fact that he fired the gun at Kauffman while "in an extreme emotional state caused by an adequate provocation." OV 5 accounts for psychological injury to a member of the victim's family, but the trial court did not expressly score it. OV 19 accounts for the trial court's perception that defendant tried to control and manipulate the situation, but it was improperly scored. The trial court did not indicate whether the guidelines inadequately considered those factors scored in OVs 1, 2, 6, and which could have been scored in OV 5, and articulated at most two valid reasons for departing from the sentencing guidelines. On this record, it is not clear whether the court would have departed based on these reasons alone. Likewise, it is difficult to ascertain the trial court's reasoning for the extent of the departure imposed and its rationale regarding whether the departure sentence was proportionate to the seriousness of the crime. As this Court stated in *Steanhouse III*, "it is necessary for a trial court to articulate its reasons for [] imposing a

---

[8] Given that the sentencing guidelines do provide for psychological injury to the victim's family in OV 5, the trial court may merely have been reflecting on the fact that the Michigan Department of Corrections did not recommend scoring OV 5.

-14-

departure sentence to permit appellate review of whether the court abided by the principle of proportionality." *Steanhouse III*, __ Mich App at __; slip op at 5, citing *Milbourn*, 435 Mich at 659-660. Accordingly, we conclude that the trial court " 'abused its discretion in applying the principle of proportionality by failing to provide adequate reasons for the extent of the departure sentence imposed,' " and we remand to the trial court for resentencing.[9] *Steanhouse III*, __ Mich App at __; slip op at 5, quoting *Steanhouse II*, 500 Mich at 476.

We affirm defendant's convictions, but reverse his sentence and remand for resentencing in accordance with this opinion. We do not retain jurisdiction.

/s/ William B. Murphy
/s/ David H. Sawyer
/s/ Jane M. Beckering

---

[9] The prosecution correctly states that the trial court is not required to provide substantial and compelling reasons for its departure or to assess whether its departure is reasonable. However, under *Milbourn* and *Steanhouse III*, it is required to provide adequate, reviewable reasons for its departure that "explain how the extent of the departure is proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Milbourn*, 435 Mich at 659-600; *Steanhouse III*, __ Mich App __; slip op at 3.